IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANGEL ECHAVARRIA, | ) | |
| | ) | Case No. 16 C 11118-ADB |
| Plaintiff, | ) | |
| | ) | Hon. Allison D. Burroughs, |
| v. | ) | District Judge |
| | ) | |
| J. MICHAEL ROACH, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE TO
DEFENDANTS' MOTIONS TO DISMISS
(Leave to file granted on November 8, 2016)**

Plaintiff, Angel Echavarria, under Fed. R. Civ. P. 12, responds to Defendants'

pending Motions to Dismiss (Docs. 44, 51, 54, 56, 58, 71, and 78) as follows:

## I.  BACKGROUND

Angel Echavarria is an innocent man who was framed for the murder of

Daniel Rodriguez. Doc. 1 at ¶1. As a result, he spent over 21 years wrongfully

imprisoned by the State of Massachusetts. *Id.* at ¶13.

This gross injustice did not happen in a vacuum. Rather, it was the result of

knowing constitutional violations by police officers—the Defendants in this case—

whose job it was to investigate and solve the murder. Instead, they framed Plaintiff.

*Id.*  Because Plaintiff did not commit the crime, was nowhere near the crime scene,

and there was not one piece of legitimate evidence connecting him to the killing,

Defendants fabricated evidence to tie him to the crime and then hid the fact that

they fabricated the evidence. *Id.* at ¶¶1, 2.

These officers did not create police reports that documented their misdeeds. Plaintiff's lawyers had to spend years unraveling Defendants' fabrications, secrets, lies, and miscarriage of justice. Plaintiff was ultimately freed as a result.

### Daniel Rodriguez' Murder

Plaintiff's nightmare of being wrongly entangled in Massachusetts' criminal justice system begins with a horrible crime—the murder of Daniel Rodriguez in January 1994. *Id.* at ¶18. Daniel Rodriguez was shot and killed in an apartment in Lynn, Massachusetts. *Id.* Daniel was a known drug dealer, and the apartment was known as a place where people could buy drugs. *Id.* at ¶20. The night that he was murdered, Daniel Rodriguez and his brother, Isidoro Rodriguez, had returned to the apartment shortly before the shooting. *Id.* at ¶19.

The two brothers encountered two armed men holding a number of people hostage in the apartment. *Id.* The two armed men tied Isidoro up with a phone cord and put him in a bedroom. *Id.* at ¶21. Daniel was taken to the bathroom, where he was shot in the head; Isidoro survived the incident unharmed. *Id.*

Since the time of the murder, not one piece of physical evidence from the crime scene remotely ties Plaintiff to the crime. *Id.* at ¶22. Similarly, no witness at the crime scene gave police any information to suggest that Plaintiff was involved. *Id.* To the contrary, the evidence that was collected, including biological evidence and statements from witnesses, make clear that Plaintiff could not have been involved in the murder. *Id.*

## Defendants Investigated the Rodriguez Murder

Defendants J. Michael Roach, Raymond Guillermo, Joseph Rowe, Russell Gokas, Charles Luise, John Scannell, and John Hollow were officers in the Lynn Police Department. *Id.* at ¶14. Defendants John Garvin, Norman Zuk, and Michael Cooney, are current or former officers of the Massachusetts State Police. *Id.* at ¶15. All of these Defendants investigated the Rodriguez murder and/or supervised other police officers during the investigation. *Id.* at ¶14, 15. Through the bogus investigation of Plaintiff, each of these Defendants committed, facilitated, or approved the constitutional violations that wrongfully took from Plaintiff most of his adult life. *Id.*

Defendant City of Lynn, Massachusetts, is a municipality of the State of Massachusetts, which oversees the Lynn Police Department. *Id.* at ¶16. Each individual Defendant was employed by the City of Lynn or was acting as an agent of the City of Lynn during the Rodriguez murder investigation. *Id.* at ¶16.

## Defendants Lied to Hide that Isidoro Identified Mariano Bonifacio as the Murderer

On the very night of the murder, Isidoro looked through booking photos and identified Mariano Bonifacio as one of the killers. *Id.* at ¶24. Shortly thereafter, Isodoro again identified Bonifacio as one of the murderers from a photo array (which had a different photo of Bonifacio) that various Defendants showed Isidoro. *Id.* at ¶25

Almost immediately after the photo array, Defendants inexplicably worked to undermine Isidoro's identification of Bonifacio. *Id.* at ¶25. For instance, they did not record Isidoro's unequivocal identifications of Bonifacio in their police reports or their investigative notes. *Id.* Instead, Defendants' official police reports affirmatively lied about the true circumstances of Isidoro's identifying Bonifacio. *Id.* Defendants made Isidoro state falsely that he had never actually identified Bonifacio as the perpetrator of the crime, and they falsely reported and testified that Bonifacio had never actually been identified as one of the perpetrators of the crime. *Id.* Thus, Defendants concealed the true circumstances of Isidoro's identification from Plaintiff, his criminal defense attorneys, and state prosecutors. Defendants' efforts to suppress Isidoro's identification of Bonifacio continue to the present day. *Id.* at ¶27.

### Defendants Hid Mariano Bonifacio's Criminal Background and His Likely Involvement in Daniel Rodriguez' Murder

While Defendants hid that Isidoro identified Bonifacio as the murderer of his brother, they knew that Bonifacio was a likely perpetrator of the murder of Daniel Rodriguez because just weeks before Daniel's shooting, they had arrested Bonifacio on charges of attempted murder in connection with the shooting of a man named Victor Batista. *Id.* at ¶¶28, 29. Both crimes shared the same *modus operandi*—both victims were known drug dealers shot during home invasions; and the shootings took place no more than a half-mile apart. *Id.* at ¶29.

4

Instead of investigating whether Bonifacio killed Daniel, Defendants concealed everything they knew about Bonifacio's likely involvement. *Id.* at ¶30. They withheld from Plaintiff, his criminal defense attorneys, and state prosecutors the fact that just weeks before they had arrested Bonifacio—the person who Isidoro had identified as Daniel's killer on the night of the crime—for a different attempted murder in connection with a shooting almost identical to the crime of which Plaintiff was wrongly convicted. *Id.* at ¶4, 30. Defendants suppressed this powerful evidence of Plaintiff's innocence, which could have been used both to exonerate Plaintiff and to impeach prosecution witnesses against Plaintiff, throughout Plaintiff's wrongful conviction. *Id.* This evidence could have also been used to bring the real murderer to justice.

**Instead of Pursuing the Real Murderer,
Defendants Framed Plaintiff**

More than a week after Daniel was killed, Plaintiff was at a Lynn barbershop with his friend Juan Rodriguez. *Id.* at ¶31. Isidoro happened to be there as well. *Id.* Plaintiff did not know Isidoro, but Isidoro approached Plaintiff and asked his name. *Id.* They exchanged pleasantries, and then Isidoro left the barbershop. *Id.*

Later that same day, Defendants approached Plaintiff and Rodriguez, who were eating dinner at a Lynn restaurant. *Id.* at ¶32. The two men cooperated fully with the police and answered questions that the police asked, including how to find them. *Id.* at ¶¶33, 34. Defendants asked Plaintiff and Juan Rodriguez whether they had been involved in Daniel's shooting, and they both denied any involvement in or

knowledge of the crime. *Id.* at ¶33. In fact, there was no evidence that Plaintiff or Juan Rodriguez were involved in Daniel's murder. *Id.* at ¶34.

Despite the lack of probable cause, Defendants arrested Plaintiff at his home the next morning for the murder. *Id.* at ¶¶34-35. Defendants claimed that Isidoro purportedly identified Plaintiff as one of the men who killed Daniel. *Id.* at ¶35.

But Defendants manufactured that false identification. *Id.* at ¶¶2, 3, 36. To further the efforts to wrongly pin the murder on Plaintiff, Defendants wrote false police reports that intentionally misrepresented the circumstances of Isidoro's false identification and of Plaintiff's arrest. *Id.* at ¶36.

Defendants filed a criminal complaint accusing Plaintiff and Juan Rodriguez of Daniel's murder based solely on the false identification that they manufactured. *Id.* at ¶37. When the charges were filed, there was no untainted evidence that either Plaintiff or Juan Rodriguez had been involved in killing Daniel. *Id.*

## Defendants Manufactured Additional Identifications of Plaintiff from Isidoro

To shore up their false charges against Plaintiff—which lacked any shred of physical evidence—Defendants took a photo of Plaintiff and showed it to Isidoro in a suggestive photo array. *Id.* at ¶38. Defendants made clear to Isidoro that he should pick Plaintiff, which Isidro did. *Id.* Shortly thereafter, Defendants held a live unduly suggestive lineup to further cement Isidoro's false identification of Plaintiff. *Id.* at ¶39. Again, because Defendants made clear that Isidoro should falsely identify Plaintiff, Isidoro did. *Id.*

Defendants pressed Isidoro to falsely identify Plaintiff despite the facts that Isidoro had already given them a description of the perpetrator, who looked completely unlike Plaintiff, and that Isidoro had conclusively identified a different person—Bonifacio—as the perpetrator. *Id.* at ¶40. To accomplish their goals to implicate Plaintiff and secure the false identifications of Plaintiff, Defendants took advantage of Isidoro's cognitive limitations, a pronounced language barrier, and Isidoro's drug intoxication. *Id.* at ¶41. To say the least, Isidoro was an obviously unreliable witness who could be manipulated, and Defendants knew it and took advantage of that to frame Plaintiff. *Id.*

### Defendants Ignored Evidence that
### Plaintiff Was Totally Innocent

While they worked to falsely implicate Plaintiff in Daniel's murder, Defendants willfully ignored and acted to undermine strong evidence that Plaintiff had nothing to do with the crime. *Id.* at ¶42. To start with, Defendants ignored that there was not one piece of physical evidence from the crime scene or from Plaintiff's house or possessions that connected Plaintiff to the killing. *Id.* at ¶43.

Defendants also disregarded all of the information they had received from witnesses that expressly excluded Plaintiff as a suspect. *Id.* at ¶44. For example, eyewitnesses, including Isidoro, described that the murderers looked nothing like Plaintiff and spoke with accents very different from Plaintiff's. *Id.*

In addition, Plaintiff had a verifiable alibi—on the night of Daniel's murder, Plaintiff was at home in Lynn with family and friends, who could all verify that

fact. *Id.* at ¶45. Instead, behind the scenes, Defendants manufactured false witness testimony to frame Plaintiff. *Id.*

### Defendants Fabricated an Additional Identification of Plaintiff

Lacking any physical evidence to tie Plaintiff to the murder, and relying only on the questionable identification by Isidoro (who had been on record of describing the murderers in a way that would exclude Plaintiff), Defendants went about manufacturing more evidence to support their case against Plaintiff.

More than a year after the crime, Defendants enlisted Gary Sevinor, a prisoner, to falsely create evidence against Plaintiff. *Id.* at ¶46. Sevinor had never been part of the investigation, but Defendants saw in him the opportunity to build their false case against Plaintiff because Sevinor was allegedly at the apartment when Daniel was murdered and was not on record as having described the real murderers. *Id.* at ¶46-47. Notably, in their reports drafted right after the crime, Defendants did not mention Sevinor as a witness who saw the killers. *Id.* at ¶47.

Nevertheless, Defendants met Sevinor in prison and showed him a photo array that included Plaintiff's photograph. *Id.* at ¶48. Defendants again used unduly suggestive techniques or outright coercion to convince Sevinor to falsely identify Plaintiff as one of Daniel's killers. *Id.* at ¶¶2, 48.

Afterward, Defendants worked with Sevinor to prepare a false story and false testimony for Plaintiff's trial. *Id.* at ¶49. Defendants concealed from Plaintiff, his criminal defense attorneys, and state prosecutors that they had fabricated Sevinor's identification of Plaintiff. *Id.* at ¶50. Sevinor's false identification of Plaintiff was

critical evidence in the case against Plaintiff because it "corroborated" Isidoro's equally false identification. *Id.* Without Sevinor's false identification, Plaintiff would not have been prosecuted or convicted. *Id.*

### Defendants Caused Plaintiff to be Wrongly Convicted and Imprisoned

Based solely on the evidence completely manufactured by Defendants, Plaintiff and Juan Rodriguez were tried by a jury in 1996. *Id.* at ¶¶2, 51. Isidoro initially refused to show up to testify falsely against Plaintiff. *Id.* at ¶52. After a bench warrant was issued, Defendants went to find Isidoro and forced him to court so that he could give his false testimony implicating Plaintiff, testimony that Defendants had manufactured. *Id.*

After a two-week trial, a jury convicted Plaintiff of first-degree murder and other crimes. *Id.* at ¶53. The trial judge acquitted Juan Rodriguez of all charges. *Id.* Plaintiff was sentenced to life in prison. *Id.* The evidence that Defendants falsely fabricated was the only evidence that ever purported to connect Plaintiff to Daniel's murder—without it, Plaintiff would never have faced charges or been convicted. *Id.* at ¶¶2, 6, 54. Without this false evidence, there was nothing to support a criminal proceeding against Plaintiff. *Id.*

On top of the introduction of false evidence manufactured by Defendants, their suppression of crucial evidence about the manipulated identifications of Plaintiff, the actual identifications of Bonifacio, and Bonifacio's identity as the real perpetrator could all have been used to exonerate Plaintiff and to impeach witnesses against him at his criminal proceeding. *Id.* at ¶55. If Defendants had not

hidden that evidence, Plaintiff would not have been charged, prosecuted, or convicted. *Id.*

When he was wrongfully convicted and imprisoned, Plaintiff was in his mid-twenties and in the prime of his life. *Id.* at ¶56.  Instead of being able to live his life in freedom—as was his right—he was arrested, prosecuted, and convicted based solely on Defendants misconduct. *Id.* Plaintiff spent the next two decades imprisoned for something he did not do. *Id.*  Defendants stole his life from him. *Id.* at ¶¶57-58.

### Plaintiff Was Finally Exonerated after His 21 Year Nightmare

On June 15, 2015, after the Superior Court of the Commonwealth of Massachusetts granted Plaintiff a new trial, the Commonwealth of Massachusetts dropped all charges against Plaintiff. *Id.* at ¶¶7, 62, 63.  Plaintiff walked out of prison a free man, having served half of his life behind bars for a crime he did not commit. *Id.* at ¶¶8, 64. Plaintiff brings his case here seeking justice for the harm that Defendants caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct. *Id.* at ¶¶9, 59. To this day, the crime remains unsolved. By focusing on Plaintiff, Defendants let the real killer remain at large for more than two decades. *Id.* at ¶23.

### II. PLAINTIFF'S COMPLAINT

Plaintiff brings multiple claims here, most of which relate to constitutional violations regarding to Defendants' wrongful fabrication of evidence against

Plaintiff and their subsequent suppression of that fabrication and other exculpatory evidence.

Count I of Plaintiff's Complaint alleges that his right to a fair trial was violated by Defendants' intentional fabrication of evidence against him and withholding of exculpatory evidence (including the fact that evidence was fabricated or that they caused witnesses to falsely identify Plaintiff). *Id.* at ¶¶66-70, 72-73. Count I further alleges that Defendants who were acting as supervisors are liable for intentionally allowing these constitutional violations. *Id.* at ¶71. Similarly, the City of Lynn is liable based on its policies and practices that caused these violations. *Id.* at ¶¶75-80, 81-83. Finally, Plaintiff alleges that this misconduct was the direct cause of his damages stemming from the loss of 21 years of his life. *Id.* at ¶74.

Count II of Plaintiff's Complaint alleges that the individual Defendants maliciously prosecuted him under federal law. *Id.* at ¶¶84-92. It further alleges that the City of Lynn is liable based on its policies and practices. *Id.* at ¶93.

Count III of Plaintiff's Complaint alleges that the individual Defendants engaged in a conspiracy to deprive Plaintiff of his constitutional rights. *Id.* at ¶¶94-99. It further alleges that the City of Lynn is liable based on its policies and practices. *Id.* at ¶100.

Count IV of Plaintiff's Complaint alleges that various individual Defendants had the opportunity to intervene to stop the constitutional violations, but failed to

do so. *Id.* at ¶¶101-105. Plaintiff claims that the failure to intervene was caused by the City of Lynn's policies and practices. *Id.* at ¶106.

Counts V-XII include various Massachusetts state law claims. Count V is a malicious prosecution claim; County VI is a claim of negligence; Count VII is a claim for intentional infliction of emotional distress; Count VIII is a claim for negligent infliction of emotional distress; Count IX is a claim under the Massachusetts Civil Rights Act; Count X is a claim for civil conspiracy; Count XI is a claim against the City of Lynn for liability based on *respondeat superior*; and Count XII is a claim against the City of Lynn based on indemnification.

## III.   ARGUMENT

In deciding whether to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)); *Jones v. Han*, 993 F. Supp. 2d 57 (D. Mass. 2014). To survive a motion to dismiss, the complaint must merely state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555. Dismissal of the complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004)

(quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Plaintiff's Complaint easily meets this threshold.

In an effort to avoid accountability for their theft of Plaintiff's liberty for over two decades, Defendants bring multiple motions to dismiss. Doc. 44, 46, 49, 51-52, 54-59, 78-79. The motions are based on 14 basic arguments:

(1) the Complaint is not sufficiently specific (City of Lynn, Cooney, Garvin, Hollow, Roach, Rowe, Zuk);

(2) the Complaint is not timely (Cooney, Hollow, Roach, Rowe);

(3) some individual Defendants are shielded by qualified immunity (Cooney, Garvin, Hollow, Roach, Rowe, Zuk);

(4) claims related to Defendants' fabricated identification are precluded (Garvin, Hollow, Roach, Rowe, Zuk);

(5) the Complaint fails to sufficiently plead a claim for federal malicious prosecution (Cooney, Garvin, Hollow, Roach, Rowe);

(6) the Complaint fails to sufficiently plead a claim for failure to intervene (Cooney, Garvin, Hollow, Roach, Rowe, Zuk);

(7) the Complaint fails to sufficiently plead a claim of state law malicious prosecution (Cooney);

(8) the Complaint fails to sufficiently plead a claim of intentional infliction of emotional distress (Cooney);

(9) Plaintiff may not recover damages for the individual Defendants' negligence (Cooney, Garvin, Hollow, Roach, Rowe, Zuk);

(10) the Complaint fails to plead a claim for recovery under the Massachusetts Civil Rights Act (Cooney, Garvin, Hollow, Roach, Rowe, Zuk);

(11) "good faith" immunity shields Defendants from state law claims (Cooney, Garvin, Hollow, Roach, Rowe);

(12) intentional tort claims are barred against the City of Lynn (City of Lynn);

(13) the negligent tort claims are barred against the City of Lynn (City of Lynne); and

(14) Plaintiff may not recover against the City of Lynn under *respondeat superior* or Indemnification (City of Lynn).

Each Defendant's arguments should be rejected (except for those relating to Lynn's motion regarding the claim of *respondeat superior*). Plaintiff has plausibly pleaded claims that Defendants' misconduct violated his rights under federal and state law.

### A.  PLAINTIFF'S COMPLAINT ADEQUATELY APPRISES DEFENDANTS OF PLAINTIFF'S CLAIMS AGAINST THEM

#### 1.  Plaintiff Sufficiently Alleges Defendants' Personal Liability

It should come as no surprise that when Defendants set about framing Plaintiff for the murder of Daniel Rodriguez, they did not leave a paper trail explaining each of their misdeeds. Thus, Plaintiff cannot point to a document in which any Defendant admits to fabricating evidence against Plaintiff or to suppressing exculpatory evidence. (In fact, the absence of such a paper trail is part of the alleged suppression; had the Defendants documented their misconduct, Plaintiff would have never been convicted). Nonetheless, Plaintiff has been able to piece together what the police investigators did in a sufficient manner to bring the Complaint here.

The Federal Rules of Civil Procedure do not require Plaintiff to know the every single detail of Defendants' secret conspiracy before filing the complaint to

vindicate his rights. It is this common reality that supports the Federal Rules of Civil Procedure framework for notice pleading and broad discovery.

Under the Rules, Plaintiff has adequately pled his claims against Defendants. Federal Rule of Civil Procedure 8(a)(2) requires that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002) (citing *Conley v. Gibson*, 355 U. S. 41, 47 (1957)); *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

This pleading standard relies on liberal discovery rules to define disputed facts and issues. *Swierkiewicz,* 534 U.S. at 512 (citations omitted). "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." *Swierkiewicz,* 534 U.S. at 512-13, (citing C. Wright & A. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed. 1990)). Thus, all Plaintiff must present are factual allegations that raise a right to relief above the speculative level and set out a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 530 U.S. 544, 127 S.Ct. 1955, 1965 (2007) (citing C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)); *Ocasio-Hernandez*, 640 F.3d at 12. Moreover, where, as here, circumstances giving rise to the case show that the defendants have sole possession of relevant

15

factual information, pleading standards are relaxed. *See*, *e.g.*, *Boykin v. KeyCorp*,

521 F.3d 202, 215 (2nd Cir. 2008) (applying this reasoning in a post-*Twombly*

challenge).

The First Circuit has identified a two-step approach in resolving a motion to

dismiss—first disregard the pleading of the legal standards of a claim

masquerading as factual allegations and then, second, treat the remaining factual

allegations as true:

> In evaluating whether a complaint states a plausible claim, we
> "perform [a] two-step analysis." At the first step, we distinguish the
> complaint's factual allegations (which must be accepted as true) from
> its conclusory legal allegations (which need not be credited)." At step
> two, we must "determine whether the factual allegations are sufficient
> to support the reasonable inference that the defendant is liable."

*Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (quoting *Cardigan Mtn. Sch. v.*

*N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir.2015), and *García–Catalán v. United States*,

734 F.3d 100, 103 (1st Cir. 2013)). *See also Ocasio-Hernandez*, 640 F.3d at 12..

Plaintiff has met those requirements here. His Complaint expressly identifies

the factual bases for his claims. The Complaint spells out with specificity, the facts

about fabricated evidence used to frame Plaintiff and the suppression of exculpatory

evidence that deprived Plaintiff of a fair trial.

That Plaintiff cannot at this point specifically identify the role of each co-

conspirator at each moment is not a basis to dismiss the complaint, which sets forth

a beyond-plausible sequence of events illustrating Defendants liability. *Cf. Jane Doe*

*No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016) (explaining that Rule 8

does not "call for the pleading of exquisite factual detail," but only a claim to relief

that is plausible on its face); *Rodríguez–Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014) (explaining, in a retaliation case, that a "complaint need not allege every fact necessary to win at trial, but need only include sufficient facts to make it plausible on its face," and that a plaintiff is not "required to provide the exact details of each incident"); *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 718 (1st Cir. 2014) (similar). Rather, that is the whole point of discovery under the Federal Rules of Civil Procedure. The efficacy of that procedure is obvious here. Plaintiff is in no position to identify and sort through the individual actions of Defendants without proper discovery. Defendants did not document which of them participated in which action to deprive Plaintiff of his rights. It will be incumbent on Plaintiff, through discovery, to sort that out. If he is unable to do so, then Defendants can seek summary judgment. But dismissal at this stage is not the proper remedy.

This is true because Plaintiff's Complaint provides Defendants all that they are required—"fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007). *See also*, *Williams v. City of Boston*, 771 F. Supp. 2d 190, 202-03 (D. Mass. 2011) ("Under the liberal notice pleading standard applicable to civil rights actions pursuant to Fed.R.Civ.P. 8(a), [the plaintiff's] allegations are sufficient to support a claim that [officers] fabricated evidence against him which resulted in his conviction for a crime he did not commit. Moreover, they are more than adequate to put the defendants on notice as to the basis for his due process claim) (citing *Carter v. Newland*, 441 F. Supp. 2d 208, 213–

14 (D.Mass. 2006) (declining to dismiss claim for alleged violation of constitutional rights where complaint was thin on detail but sufficient to notify defendants of claim)).

Similarly, *in Limone v. Condon*, the First Circuit already approved allegations very similar to these in a due process context., 372 F.3d 39, 49 (1st Cir. 2004). There, the plaintiffs sued officers who framed them for murder. In allowing the complaint to proceed at this stage, the First Circuit noted that the complaint that identified officers as part of a task force that engaged in the constitutional violation allowed for the reasonable inference that each officer was liable:

> The factual allegations pertaining directly to [the officer] combined with the plausible inferences that must be drawn in the plaintiffs' favor, suffice to survive a motion to dismiss. [The officer] was an active member of the joint federal-state task force—a fact that supports a plausible inference that he was privy to information gathered by the other members of the team (including [other officers]).

*Id.* (citations omitted).

Although the Complaint here contains allegations of misconduct for which all Defendants may be jointly responsible, nothing prevents each of the named Defendants from understanding each element in the Complaint. Each Defendant knows what he did or did not do, and each can admit or deny every single one of the specific allegations that Plaintiff has pled based on that knowledge and consistent with that particular Defendant's view of the truth.

Moreover, the very nature of Plaintiff's claims here prevent him from ascertaining which of the many individual defendants is responsible for particular misconduct so that multiple Defendants may be liable for single acts of misconduct.

*See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 n.8 (1979) (finding that an injured party may sue single tortfeasor for full damages for an indivisible injury); *Hall v. Ochs*, 817 F.2d 920, 926 (1st Cir. 1987) (for damages in Section 1983 case, all defendants who cause the injury can be jointly found liable); *see also Richman v. Sheahan*, 512 F.3d 876, 884-85 (7th Cir. 2008) (noting that defendants may be jointly and severally liable for injuries even if it remains unclear which of them committed specific acts).[1]

One final note regarding the sufficiency of Plaintiff's complaint is warranted here. When considering whether a complaint sufficiently states claims against Defendants "[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible[.]" *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013) (quoting *Ocasio–Hernández*, 640 F.3d at 14 (citations omitted); *see, e.g., Morales v. Chadbourne*, 996 F.Supp.2d 19, (D. R.I. 2014) (noting that the Court was "[l]ooking at the Complaint as a whole" and evaluating what the "collective allegations plausibly plead"). Here, Defendants arguments must be rejected where, as often, they fail to adhere to this rule by

---

[1] Indeed, Plaintiff can win this case even if he is ultimately unable to identify which of the Defendants committed which particular acts. Plaintiff need not identify specific acts, because "[w]hile it is true that a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right, a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *see also Hafner v. Brown*, 983 F.2d 570, 578 (4th Cir. 1992) (finding liability for officers standing by while others broke the law). If Plaintiff can win this lawsuit even if he is never able to identify every single specific act every single Defendant committed, then Plaintiff's claims are certainly entitled to survive the pleading stage.

challenging the Complaint in a piecemeal fashion as if certain portions did not relate to the others. .

In sum, read as a whole, Plaintiff's Complaint makes sufficient and plaubisle allegations that demonstrate his right to recover for the violations of his constitutional rights. There is no basis to dismiss those claims.

### 2.  Plaintiff Alleges Viable Claims of Supervisory Liability

As noted above, Defendants did not create a blueprint for how they went about framing Plaintiff for murder. But Plaintiff has sufficient evidence to conclude that various Defendants acted in a supervisory capacity during the injustice that took 21 years of his life and that those supervisors knowingly allowed the fabrication and suppression of evidence against him. He, therefore, brings viable claims against those Defendants alleging that they had knowledge of the misconduct and ignored it. Doc. 1 at ¶71.

Plaintiff's allegations of supervisory liability meet the framework required to allege an affirmative link between the supervision and the constitutional violation:

> Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.

*Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008) (internal citations and quotations omitted); *Han*, 993 F. Supp. 2d at 67.

Defendants Rowe and Hollow challenge those claims as being insufficient. Doc. Doc. 49 at 11-12; 52 at 9-10. Given the foregoing, Defendants' challenges are

baseless. For supervisory liability to attach, Plaintiff need only plausibly allege that Defendants' supervisory action or inaction was affirmatively linked to the constitutional violations. A finding of deliberate indifference requires a showing that "it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Pineda*, 533 F.3d at 54. Such supervisory indifference includes actual knowledge of or being willfully blind to the constitutional violations. *Feliciano–Hernandez v. Pereira–Castillo*, 663 F.3d 527, 535 (1st Cir. 2011).

Here, Plaintiff alleges that Defendants affirmatively acted to fabricate and suppress evidence to frame Plaintiff. Plaintiff has specifically alleged that the "Defendants who were supervisors charged with overseeing the investigation of Daniel Rodriguez's murder and the other individual Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and find the person who had killed Daniel." Dkt. 1, at ¶71; *see also id.* at ¶¶14-15 (alleging that the supervisor defendants "facilitated, and approved the constitutional violations at issue in this case"). The Complaint also alleges that the supervising defendants approved and signed the fabricated and false evidence against Plaintiff "despite their knowledge that the information contained in those reports was false." *Id.* at ¶68, Given these allegations, it must be assumed as true and plausibly follows that

the supervisors working on the Rodriguez homicide case either knew of,

affirmatively acquiesced in, or, at a minimum were grossly negligent to the level of

deliberate indifference to allow the generation and approval of false evidence, while

allowing police officer defendants to secret exculpatory evidence.  happen. *Pineda*,

533 F.3d at 54.These allegations far exceed Plaintiff's duty to  present only

plausible factual allegation of an affirmative link between the supervisory liability

and the constitutional violation. *See Morales v. Chadbourne*, 793 F.3d 208, 223 (1st

Cir. 2015). Plaintiff's Complaint, therefore, properly states a supervisor liability

claim under § 1983.

### 3.  Plaintiff Alleges Viable Claims of Municipal Liability

Similarly, Plaintiff alleges viable claims of municipal liability against the

City of Lynn under *Monell v. Dep't of Social Services of City of New York*, 436 U.S.

658 (1978). Plaintiff's can proceed on this basis by illustrating a policy and its link

to a particular constitutional violation. "Official municipal policy includes the

decisions of a government's lawmakers, the acts of its policymaking officials, and

practices so persistent and widespread as to practically have the force of law."

*Connick v. Thompson*, 131 S.Ct. 1350, 1359, (2011). The  detailed allegations here

make clear that Plaintiff is not seeking to wrongly impose *respondeat superior*

liability on the City of Lynn. Instead, Plaintiff has plausibly demonstrated the

affirmative link between the violation of his constitutional rights, and the practices,

policies, customs and decisions of the City's final policymaker sufficient to illustrate

satisfy *Monell*. Plaintiff has alleged that his injuries were caused by the practices

and customs of the City, as well as the actions of final policy making officials for the

city; that the City "promulgated rules, regulations, policies, and procedures governing witness interviews, photo lineups, live lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision of employees" of those in the Lynn police department; that these policies, rules; and that such regulations were implemented to cause the deprivation of his constitutional rights. Dkt. 1, at ¶¶75-77. In addition, Plaintiff has alleged that  the City had notice of a widespread practice, in criminal investigations, of routinely depriving suspects of exculpatory evidence, subjecting suspects to criminal proceedings on the basis of false evidence, and of depriving suspects of their liberty without probable cause. *Id.* at ¶78. These practices flourished, only because the leaders supervisors, and policy makders of the Defendant City of Lynn encouraged this sort or behavior by, among other things, failing to adequately train, supervise, and discipline their officers. *Id.* at ¶79.In sum, Plaintiff has alleged that the City of Lynn maintained policies and practices that failed to train and control officers and that these policies and practices were the moving force behind the constitutional violations alleged. Doc. 1 at ¶¶75-83. These allegations are more than sufficient.

In fact, Plaintiff's claims here against Lynn are similar to those that the First Circuit found to be sufficient in *Haley v. Boston*, 657 F.3d 39, 51 (1st Cir. 2011). There, the plaintiff alleged that the Boston Police Department "had a standing policy that was itself unconstitutional and that the City failed to train its personnel

in their evidence-disclosure obligations despite notice of persistent and ongoing violations." *Id*. The First Circuit concluded that those allegations were "sufficient to anchor two separate *Monell*-type claims, each demanding a different kind of proof." *Id*. The First Circuit expressly noted that the plaintiff would need to develop evidence in discovery to support those claims, but that the allegations themselves were sufficiently pled for Plaintiff to proceed. *Id*. The same result should apply here.

### 4.  Plaintiff States a Viable § 1983 Conspiracy Claim

Some of the Defendants move to dismiss the § 1983 conspiracy claim in Count III of Plaintiff's complaint, arguing that it fails to sufficiently allege a conspiracy claim. Doc. 49 at 21, Doc. 52 at 13; Doc. 55 at 12-13; Doc. 57 at 10-11; Doc. 59 at 8-9; Doc. 79 at 9.  The moving Defendants are wrong, and Plaintiff's § 1983 conspiracy claim should not be dismissed.

A conspiracy claim under Section 1983 encompasses "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008) (citing *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988)). A complaint alleging conspiracy is required to include plausible allegations of an agreement among the conspirators to violate a plaintiff's rights or facts that allow the reasonable inference of such an agreement. *See LeBaron v. Spencer*, 527 F. App'x 25, 33 (1st Cir. 2013) (*per curiam*); *Williams v. City of Boston*, 771 F. Supp. 2d 190, 204 (D.Mass. 2011). Thus, "[t]o present an adequate conspiracy claim, there must be

allegations of (1) an agreement between two or more state actors . . . (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Williams*, 771 F. Supp. 2d at 204  (quoting *Lumpkin v. Lucey*, Civil Action No. 09–11921–RGS, 2010 WL 1794400, at *5 (D.Mass. May 4, 2010) (slip op.) (quotations and citations omitted)).

The allegations in *Williams* are instructive to show that Plaintiff's allegations are sufficient because they are very similar to those in this case.  There, the defendants argued the conspiracy claim should be dismissed because it did not contain factual allegations about the conspiracy elements. *Williams*, 771 F. Supp. 2d at 205. The court there noted that conspiracies seldom happen in the light of day: "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible to direct proof: more often than not such an agreement must be inferred from all the circumstances." *Id.* (quoting *Earle*, 850 F.2d at 843). It then allowed the conspiracy claims to proceed, finding that the plaintiff sufficiently alleged that the defendants deprived him of his constitutional rights by initiating a malicious prosecution and fabricating inculpatory evidence against him. *Id.* It further found that all reasonable inferences from the complaint, viewed in the plaintiff's favor, supported the existence of an agreement between the defendants to violate the plaintiff's constitutional rights in that the defendants had all together responded to 911 calls together, jointly investigated the plaintiff, pursued false criminal charges against him, and fabricated evidence against him. *Id.* Based on that joint action, the court found the allegations sufficient that the defendants acted in concert to frame the

plaintiff for a crime he did not commit. *Id.* Under those circumstances, the court found it reasonable to infer a conspiracy. *Id.* (citing *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989).

Similarly, Plaintiff sufficiently alleges the elements of conspiracy based on the same types of allegations found sufficient in *Williams*. Doc. 1 at ¶¶94-100. As noted above, he alleges that all Defendants were part of the investigation team, working together to bring about the wrongful prosecution of Plaintiff. He further alleges a series of unconstitutional acts—fabricating evidence and then suppressing it. Those allegations allow for an inference of an agreement among Defendants to violate Plaintiff's rights. In fact, it is a challenge to imagine a scenario in which that level of evidence fabrication would not have been the product of a conspiracy. Plaintiff's Complaint meets the requirements of Federal Rule Civil of Procedure 8 with regard to his claim of conspiracy. Defendants' motions should be denied.

## B. PLAINTIFF'S COMPLAINT IS TIMELY

### 1. *Heck v. Humphries* Deferred Accrual of Plaintiff's Claims Because They Necessarily Imply the Invalidity His Conviction

The Defendants who argue that the complaint is untimely misunderstand the applicable law here. Although the statute of limitations for a § 1983 case is based on state law (here three years), the accrual date of "'is a question of federal law that is *not* resolved by reference to state law.'"*Williams v. City of Boston*, 771 F. Supp. 2d 190, 201 (D. Mass. 2011) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (emphasis in *Wallace*); *see also Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 96 (1st Cir. 2013) (same);*Guzman-Rivera v. Rivera-Cruz*, 29 F.3d 3, 5 (1st. Cir. 1994)

("federal law controls the accrual of section 1983 claims"). A cause of action accrues only when "the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Heck v. Humphrey*, 512 U.S. 477, 488 (1993) (internal quotes and citation omitted). Here, Plaintiff's claims did not accrue until Plaintiff's criminal conviction was overturned and the criminal proceedings against him dismissed. Because it is undisputed that Plaintiff filed this action well within three years of that date, his claims are timely.

In other words, Plaintiff's claims are controlled by the deferred-accrual rule of *Heck*, which provides that claims that would necessarily impugn a conviction cannot be brought until after that conviction has been invalidated. As the Supreme Court put it:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486-87.

In short, the "*Heck*-bar" is a rule of deferred accrual: "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90. The *Heck* rule ensures that any damages claim attacking the constitutionality of a conviction must wait until the conviction has been set aside. *Id.*; *see also Statchen v.*

*Palmer*, 623 F.3d 15, 18 n.1 (1st Cir. 2010) ("A damages claim that would necessarily imply the invalidity of the claimant's prior criminal conviction, sentence or detention is not cognizable under section 1983 unless and until the plaintiff has first obtained a favorable termination of the conviction.").

Consequently, a plaintiff who brings claims challenging the constitutionality of his conviction or sentence while that conviction or sentence remains in place is barred from filing a lawsuit, which defers accrual of those claims until the conviction is set aside. *Id.* at 489-90 ("[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated."). The *Heck* rule ensures that any damages claim attacking the constitutionality of a conviction waits until the conviction has been set aside. *Id.*; *see also Figueroa v. Rivera*, 147 F.3d 77, 81 (1st Cir. 1998) ("[*Heck*] makes the impugning of an allegedly unconstitutional conviction in a separate, antecedent proceeding a prerequisite to a resultant section 1983 action for damages"); *Barbosa v. Conlon*, 962 F. Supp. 2d 316, 329-30 (D. Mass. 2013); *Salcedo v. Town of Dudley*, 629 F. Supp. 2d 86, 102 (D. Mass. 2009).

To determine whether *Heck* applies, the Court the court must consider whether a judgment for plaintiff would "necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. This inquiry involves examining the injury complained of and the theory of the complaint. . Accordingly, important here is that the application of *Heck* and other binding Supreme Court precedent depends on the particular claims asserted in the particular case, which is a fact-specific inquiry

that turns on the allegations in the complaint and what, based upon those allegations, a favorable judgment for the plaintiff in that action would imply about the underlying criminal conviction. *See Wallace v. Kato*, 549 U.S. 384, 390-91 (2007) (considering a false arrest claim and evaluating the "theory of the complaint"); *Guzman-Rivera*, 29 F.3d at 5 ("The first step in fixing accrual is to identify the actual injury of which the plaintiff complaints); *Thore v. Howe*, 466 F.3d 173, 180 (1st Cir. 2006) (discussing whether the "theories" asserted by the plaintiff of an excessive force case required the invalidity of a conviction of assault on an officer for purposes of deciding if *Heck* applies, and finding that the theory "he was not guilty of assault at all" was "plainly barred by *Heck*"); *Bochart v. City of Lowell*, 2016 WL 696087, at *5 (D. Mass. Feb. 19, 2016) (In other words, a court must consider each of the plaintiff's theories of relief individually when determining whether a § 1983 claim is viable under *Heck*."). Applying that framework here supports that *Heck* deferral is proper.

### 2. Heck Deferral Applies Because Plaintiff's Success in this Action Necessarily Implies the Invalidity of His Conviction

The very point of these claims is that Plaintiff was wrongfully convicted, and that Plaintiff should be compensated for the injury of being wrongfully (and maliciously) prosecuted. These sorts of claims are those that quintessentially imply the a conviction was invalid. Indeed, Plaintiff's Complaint sets out unambiguously that his conviction was in fact invalid and would not have occurred but for fabrication and suppression of evidence, which violated his constitutional rights.

See Doc. 1, at ¶72, 86. These claims involve misconduct in violation of core criminal trial rights. *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2004).

Indeed, it is well established that for plaintiffs like Mr. Echavarria, who challenge the constitutionality of their conviction, *Heck* controls accrual. *See, e.g.*, *Guzman-Rivera*, 29 F.3d at 5 (finding *Heck* applied to claims where "the actual injury implicitly alleged" is that Guzman was wrongfully convicted and/or wrongfully detained after defendants were apprised of the exculpatory evidence); *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 3-4 (1st Cir. 1995). There is no question that success in this § 1983 action necessarily implies the invalidity of Plaintiff's conviction; indeed, one of the principal purposes of this lawsuit is to demonstrate how Mr. Echavarria's conviction was unjust, invalid, and based on fabricated and suppressed evidence.

Accordingly, the deferred accrual rule from *Heck* controls, meaning Plaintiff's claims did not accrue for statute of limitations purposes until his conviction was vacated and the Commonwealth of Massachusetts dropped all charges against him in 2015. Plaintiff filed his lawsuit on June 15, 2016, well within the three-year limitations period for § 1983 suits in Massachusetts. *Cayo v. Fitzpatrick*, 95 F. Supp. 3d 8, 13 at n. 3 (D. Mass. 2015). Plaintiff's lawsuit is timely.

### 3. *Wallace v. Kato* Does Not Apply Here

In formulaic arguments, Defendants Hollow, Lynn, Roach, and Rowe argue that *Wallace v. Kato*, 549 U.S. 384 (2007), tolls the running of the statute of limitations for Plaintiff's Fourteenth Amendment fair trial claims (but not Plaintiff's malicious prosecution claim) at the time that legal process was initiated

against Plaintiff in the criminal case. Doc. 49 at 23; Doc. 52 at 16. That argument is a misunderstanding of both *Heck* and *Wallace*. Under *Heck*, in determining whether its deferred accrual rule applies, the Court analogizes to the nearest common-law tort. Claims asserted for the *injury* of wrongful conviction—like this one—are analogized to malicious prosecution claims, and accrual is deferred until that conviction has been set aside. *See Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) ("[C]laims resembling malicious prosecution do not accrue until the prosecution has terminated in the plaintiff's favor.").

*Wallace,* by contrast, considered a Fourth Amendment false arrest case that expressly distinguishes its accrual analysis under *Heck* from a claim, like the due process claim under the Fourteenth Amendment here, that attacks the fairness of the later criminal proceedings. *Wallace*, 549 U.S. at 389-90. In *Wallace*, the Court expressly identified that claims that attack the fairness of the court proceedings themselves apply a totally separate accrual analysis under *Heck*, but that a false arrest claim under the Fourth Amendment terminates at the point that legal proceedings begin, so the *Heck* concern about the validity of a conviction never attaches. *Id.* at 390.

*Wallace* holds, therefore, that the *Heck* bar does not delay accrual of a Fourth Amendment *false arrest* § 1983 claim. *Id.* at 389-90, 394. After that, the Court must examine the injury asserted to determine whether or not *Heck* applies. There are, to be sure, some close cases—like an excessive force claim when the plaintiff has been convicted of arresting an officer. *See id. at 485 n. 6; e.g.*, *Havens v. Johnson*, 783

F.3d 776 (10th Cir. 2015) (excessive force claim barred by *Heck* because plaintiff's "only theory of relief is based on his innocence, and this theory is barred by *Heck*"); *Thore*, 466 F.3d at 180 (finding only one of plaintiff's two theories for relief on excessive force claim barred by Heck). Most typical Fourth Amendment violations are complete, (*i.e.*, before the criminal case), and do not implicate or possibly undermine a later conviction. *Id.* As a result, *Wallace* does not even apply to all Fourth Amendment claims, and it says even less about claims that concern the injury of wrongful conviction, as this one does. *Wallace* provides only that a false arrest claim cannot necessarily imply the invalidity of a conviction, and its accrual is not barred by *Heck*. 549 U.S. at 389-90, 394.

Put differently, *Wallace* is not a rule of general application. It is a context-specific application of *Heck* that applies only to false arrest claims. Specifically, at most, under *Wallace* claims that relate to a wrongful arrest accrue when a person is bound over following their arrest, but claims that relate to a wrongful conviction accrue only after the conviction has been invalidated under *Heck*.

Defendants' argument therefore misunderstands the narrow holding of *Wallace* and the distinction the Supreme Court has drawn between false arrest claims, such as those at issue in *Wallace*, and claims based on violations of trial rights protected by the Fourteenth Amendments, such as those at issue in this case. The First Circuit, in applying its *Heck* has recognized that the Plaintiff's theory of the complaint and injury complained of is what matters. *Statchen*, 623 F.3d 15; *Guzman-Rivera*, 29 F.3d 3; *Thore*, 466 F.3d 173. Defendants' have ignored the fact

that *Wallace* is limited to false arrest claims and completely failed to analyze the theory of the complaint here. Because Plaintiff's "theory of relief is based on his innocence … this theory [was] barred by Heck" until Plaintiff's conviction was overturned in 2015. *Havens*, 783 F.3d at 784. His claim is therefore timely.[2]

---

[2] Thinking through Defendants' position leads to the conclusion that it must be rejected. Under their theory, an individual convicted in Massachusetts on the basis of fabricated and concealed exculpatory evidence must file a § 1983 suit seeking to hold liable those who fabricated and concealed evidence that causes a conviction within three years of the date that charges were brought. Undoubtedly, for many defendants this would mean filing a civil lawsuit concurrently with the criminal proceedings themselves, including post-trial motions, criminal appeals, state post-conviction proceedings, and federal habeas corpus actions—precisely the scenario that *Heck* and its progeny are designed to avoid. It would mean that wrongfully convicted individuals would have to file lawsuits before (rather than after) their exoneration and their convictions set aside. The whole point of *Heck* is to ensure that the allocation of *habeas* claims do not bleed over in to § 1983 litigation. Adoption of Defendants' scheme would therefore run contrary to not only *Heck*, but also sound judicial administration of federal constitutional claims.

## C. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR FABRICATING AND SUPPRESSING EVIDENCE OR FOR MALICIOUSLY PROSECUTING PLAINTIFF

This is not a qualified immunity case. First, qualified immunity is almost always a bad ground for dismissal at the 12(b)(6) stage, and that is certainly true here, where the Complaint contains everything required to state a § 1983 claim based on fabricating eyewitness identifications and then suppressing the evidence surrounding that fabrication in violation of the Fourteenth Amendment.[3] Second, Defendants will never be entitled to qualified immunity on this claim—regardless of the stage of the case—because it was clearly established at the time that Plaintiff was arrested and prosecuted (and for many decades before that) that the Fourteenth Amendments bars police from falsely creating evidence and suppressing that fact for use in criminal cases. In fact, there are few constitutional protections more deeply rooted than this one. Nevertheless, Defendants Cooney, Garvin, Hollow, Roach, Rowe, and Zuk all seek the shelter of qualified immunity, despite the clear nature of Plaintiff's claims that Defendants violated his clearly established rights. Doc. 49 at 17-19; Doc. 52 at 10-13; Doc. 55 at 19-20; Doc. 57 at 7-9; Doc. 59 at 5-8; Doc. 79 at 6-7.

---

[3] In order to defeat a qualified immunity defense at the pleading stage, all a plaintiff must do is to state a claim under § 1983 that a person acting under color of state law has deprived him of a federal right. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Supreme Court has warned that lower courts may never alter this basic pleading requirement of § 1983 claims simply because a defendant asserts a qualified immunity defense. *Crawford-El v. Britton*, 523 U.S. 574, 594-97 (1998).  So long as the complaint satisfies Rule 8 with respect to both elements of a § 1983 claim, dismissal is inappropriate. As noted above, Plaintiff's Complaint does satisfy Rule 8.

"Qualified immunity is a judge-made doctrine." *Limone*, 372 F.3d at 43. "The elementary justification for the doctrine is that public officials performing discretionary functions should be free to act without fear of retributive suits for damages except when they should have understood that particular conduct was unlawful." *Id.* at 44 (citing *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). "That awareness depends, in large part, on the extent to which legal rules were clearly established when the official acted." *Id.* (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The First Circuit employs the following analysis to evaluate whether a particular defendant is entitled to qualified immunity:

> (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation. The second prong, in turn, has two parts. We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right. The salient question is whether the state of the law at the time would have given a reasonably competent officer clear notice that what he was doing was unconstitutional.

*Mlodzinski v. Lewis*, 648 F.3d 24, 32-33 (1st Cir. 2011) (internal citations and quotations omitted). *See also MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014). On a motion to dismiss, the issue is whether the facts alleged, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991); *Santana v. Calderon*, 342 F.3d 18, 23 (1st Cir. 2003).

Under this analysis, qualified immunity fails. First, as noted above, Plaintiff has pled sufficient allegations that Defendants denied him a fair trial under the Fourteenth Amendment and maliciously prosecuted in violation of his rights under the Fourth and Fourteenth Amendments. Second, at the time that they framed Plaintiff, it was clearly established both that it violated Plaintiff's constitutional rights to fabricate and suppress evidence to frame him for murder, thereby violating Plaintiff's rights to a fair trial and to be free from prosecution without probable cause.

### 1. Defendants are not Shielded by Qualified Immunity from Plaintiff's Due Process Claims

Plaintiff's due process claims against Defendants are not barred by the doctrine of qualified immunity. The First Circuit, in categorically rejecting a similar qualified immunity defense as that raised by Defendants here, described the analysis about whether the right to be free at trial from manufactured and suppressed evidence was clearly established (almost 30 years before Defendants' misconduct) as "easy pickings." *Limone*, 372 F.3d at 44. The same is true here.

In *Limone*, the plaintiffs sued the defendants relating to allegations that they were framed for a murder that resulted in their convictions in 1968. *Id.* at 42. As here, the plaintiffs there claimed that the defendants engaged in an active conspiracy to secure and sustain convictions against innocent men by purposefully suborning false testimony from a key witness and suppressing exculpatory evidence. *Id.* at 44, 46. Similarly, the allegations there "include[d] suballegations

that occasionally involved[d] *Brady* violations" as an "integral part of the overall

story." *Id.* at 46-47.

Plaintiff here, like those plaintiffs, "asseverate that an individual's right not

to be convicted by these tawdry means—his right not to be framed by the

government—is beyond doubt." *Id.* at 44. The First Circuit agrees:

> …if any concept is fundamental to our American system of justice, it is
> that those charged with upholding the law are prohibited from
> deliberately fabricating evidence and framing individuals for crimes
> they did not commit. Actions taken in contravention of this prohibition
> necessarily violate due process (indeed, we are unsure what due
> process entails if not protection against deliberate framing under color
> of official sanction). Thus, we resist the temptation to expound
> needlessly upon the first element in the qualified immunity catechism
> and simply pronounce that requirement satisfied.

*Id.* at 44-45. The right was, therefore, clearly established in 1994, just as certainly

as the First Circuit in *Limone* found it to be in 1968.

Defendants were on notice of that clearly established right. In fact, the right

not to be framed by law enforcement officers was clearly established long before

1994. *Id.* at 46.

The First Circuit in *Limone* explained the lengthy history supporting that the

right not to be convicted with fabricated evidence goes back to the 1930s. *Id.* (citing

*Mooney v. Holohan*, 294 U.S. 103 (1935) (*per curiam*)).  In *Mooney*, the Supreme

Court explained that due process is violated by contriving a conviction through the

deliberate deception of the court and jury by testimony known to be untrue.

*Mooney*, 294 U.S. at 112. The following term, the Supreme Court "reaffirmed that

the Due Process Clause forbids convictions predicated on deliberate deceptions."

*Limone*, 372 F.3d at 46 (citing *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)). In 1942, the Supreme Court "needed only a single paragraph and a citation to *Mooney* to buttress its conclusion that 'allegations that [the petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him . . . sufficiently charge a deprivation of rights guaranteed by the Federal Constitution.'" *Id.* (quoting *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)). "Given these precedents, it is not surprising that, as early as 1951, [the First Circuit] described *Mooney*'s core premise as "well-settled." *Id.* (citing *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st Cir. 1951)). In 1959, the Supreme Court held that the *Mooney* right protected against circumstances in which "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

In *Napue*, the court "established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* The Court found that right "implicit in any concept of ordered liberty." *Id.* In 1967, a unanimous Supreme Court expressly identified the long history of finding that due process barred the use of knowingly false evidence:

> More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle.

*Miller v. Pate*, 386 U.S. 1, 7 (1967) (citations omitted). The First Circuit's qualified immunity analysis concludes that for decades the law was clearly established and officers were on notice that they could not frame criminal defendants:

> That ends this phase of our archival journey into the annals of constitutional jurisprudence. We conclude, without serious question, that *Mooney* and its pre–1967 progeny provided reasonable law enforcement officers fair warning that framing innocent persons would violate the constitutional rights of the falsely accused.

*Limone*, 372 F. 3d at 48; *see also Bazinet v. Thorpe*, 4:14-CV-40082-TSH, 2016 WL 3149657 at *7 (D.Mass. June 3, 2016) (denying qualified immunity based on fabrication of evidence allegations)

This line of cases also includes the fact that it was clearly established well-before 1995 that the deliberate suppression of exculpatory evidence, a *Brady* violation was unconstitutional and that a police officer is not entitled to qualified immunity on this basis. *See Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013) (no qualified immunity for suppressing material exculpatory evidence—the right was clearly established in 1989); *Haley v. City of Boston*, 657 F.3d 39, 49 (1st Cir. 2011) ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights.");; *Han*, 993 F.Supp.2d at 67 (no qualified immunity for failing to disclose exculpatory evidence).[4]

---

[4] To avoid this clear line of cases, Defendant Hollow gives a half-hearted effort to say that if Plaintiff's claim is premised only on *Brady v. Maryland*, then it was not well settled that a police officer could be found liable for violating due process by not turning over exculpatory evidence. Doc. 49 at 18. This argument fails for at least three reasons. First, the Supreme Court established long before the Defendants actions in this case that police

In analyzing a motion to dismiss about whether it would have been clear to an objectively reasonable officer that what he was doing violated the constitution, the legal analysis will go a long way toward answering that question. *Limone*, 372 F. 3d at 48. This case demonstrates that it would have been "transparently clear to a reasonable officer situated similarly [to Defendants]" that fabricating eyewitness identifications and then using that evidence in court to prevent a fair trial violated Plaintiff's right to due process. *Id.* "[No] reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit." *Id.* at 50.

Taking the facts alleged in the Complaint as true, as is required at this stage, Defendants are not entitled to qualified immunity on Plaintiff's due process claim.

### 2. Defendants are not Shielded by Qualified Immunity from Plaintiff's Federal Malicious Prosecution Claim

Defendants' claim for qualified immunity for Plaintiff's federal malicious prosecution claim similarly must fail. Defendants confuse the constitutional violation with the name of the complaint against them. The law was clearly established in 1994 that it was unlawful to detain and bring criminal charges

---

officers who violate *Brady* can be liable where, as here, they deliberately suppress exculpatory evidence. *See Complaint*, Doc. 1, at ¶67 (alleging that the Defendants "deliberately withheld exculpatory evidence"); *Drumgold*, 707 F.3d at 43 (denying qualified immunity based upon *Brady* claim related to a 1989 trial and holding that "[t]here can be no doubt that, under the line of cases running from *Mooney* and *Pyle* to *Brady*, the law was firmly settled at the time of [Plaintiff's 1989] criminal trial that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant"). Second, the First Circuit in *Limone* made clear that plaintiffs, not defendants define the scope of their claims for qualified immunity analysis. 372 F. 3d. at 46-47 ("To restrict the plaintiffs to a *Brady* claim would require us to disregard the forest and focus single-mindedly on a particular tree"). Finally, Defendant Hollow admits that the right to a fair trial without the suppression of exculpatory evidence was clearly established before Defendants misconduct here. Doc. 49 at 18.

without probable cause to do so, and it was especially clear (as detailed above) that it was unlawful to fabricate and suppress evidence to wrongly frame an innocent person for a crime. Regardless, federal malicious prosecution claims have been recognized in the First Circuit since before Plaintiff was wrongly framed for murder.

The First Circuit recognized a substantive or procedural due process right to be free from malicious prosecution as far back as 1990:

> [a]ll federal claims for malicious prosecution are borrowed from the common law tort ... [which] imposes liability on a private person who institutes criminal proceedings against an innocent person without probable cause for an improper purpose. The federal claim under section 1983 for malicious prosecution differs from the state civil suit in that it requires that state officials acting 'under color of law' institute criminal proceedings against the plaintiff and thereby deprive him of rights secured under the Constitution.

*Smith v. Massachusetts Dep't of Correction*, 936 F.2d 1390, 1402 (1st Cir. 1991) (quoting *Torres v. Superintendent of Police*, 893 F.2d 404, 409 (1st Cir. 1990)). The First Circuit recognized then that malicious prosecution based on procedural due process required distortion and corruption of the legal process (like here):

> For procedural due process purposes ... the plaintiff usually must show the alleged conduct deprived him of liberty by a distortion and corruption of the processes of law, *i.e.*, corruption of witnesses, falsification of evidence, or some other egregious conduct resulting in the denial of a fair trial....

*Id.*

The United States Supreme Court in *Albright v. Oliver*, 510 U.S. 266 (1994), "strongly suggested in dicta" that there was a Fourth Amendment right to be free from malicious prosecution. *Hemandez–Cuevas v. Taylor*, 723 F.3d 91, 98-99 (1st

Cir. 2013) (citing *Albright*, 510 U.S. at 274)). The First Circuit noted that "[t]here has long been a sense among the courts that the Constitution provides some protection for individuals who are targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period." *Hernandez–Cuevas*, 723 F.3d at 98. *See also Britton v. Maloney*, 196 F.3d 24, 28 (1st Cir. 1999); *Nieves v. Sweeney*, 241 F.3d 46, 54 (1st Cir. 2001).

In *Hernandez–Cuevas*, the First Circuit held that a plaintiff may bring a malicious prosecution claim under § 1983 if he or she can establish that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor. *Id.* at 100–01. Although it ruled in 2013, the Court nevertheless noted that the cause of action had existed for some time in the First Circuit:

> [t]his holding makes explicit what has long been implicit in our case law. In the past we have held that "some truths are self-evident.... [I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.

*Id.* at 100 (quoting *Limone*, 372 F.3d at 44-45).

Although qualified immunity is a legal issue, courts should be careful "not to permit a defendant to hijack the plaintiff's complaint and recharacterize its allegations so as to minimize his or her liability." *Limone*, 372 F.3d at 46. A fair reading of Plaintiff's Complaint is that Defendants joined together in a scheme to fabricate eyewitness evidence, withhold exculpatory evidence, obstruct justice and offer false testimony. They did so knowing that there was no probable cause to

initiate criminal charges against Plaintiff. As detailed above, at no point could a reasonable police officer have believed that such conduct would be permissible.

Moreover, it was clearly established by 1994 that it violated the constitution to bring criminal charges without probable cause. *Smith v. Massachusetts Dep't of Correction*, 936 F.2d 1390 (1st Cir. 1991) (recognizing that in 1991, initiating criminal proceedings without probable cause was actionable under Section 1983); *Meehan v. Town of Plymouth*, 167 F.3d 85 (1st Cir. 1999) (acknowledging that initiating criminal proceedings without probable cause in 1988 was actionable under Section 1983).

At this stage, since the law was clearly established that police could not lawfully institute criminal legal proceedings without probable cause, it follows that Defendants were on notice of that notion.  Because the facts that underpin Plaintiff's malicious prosecution claim are the same as those that make up his due process claim and because it was clearly established in 1994 that it was unlawful to seize an innocent person without probable cause, and to then go about fabricating evidence to present a false claim of probable cause, qualified immunity does not bar any of the claims asserted against Defendants for malicious prosecution.

## D. PLAINTIFF SUFFICIENTLY PLEADS MALICIOUS PROSECUTION UNDER SECTION 1983

Plaintiff properly brings a malicious prosecution claim here under Section 1983. The elements of that claim are that Defendants arrested him and pursued his prosecution knowing that Plaintiff was innocent (the lack of probable cause) and fabricated evidence to do so. Doc. 1 at ¶¶84-93. Defendants claim that there is no

available federal malicious prosecution claim here. Doc. 49 at 20-21; Doc. 55 at 10-12; Doc. 57 at 10; Doc. 59 at 7-8; Doc. 79 at 10. They include a lengthy discussion about whether malicious prosecution is properly brought under the Fourth Amendment or under procedural or substantive due process.

For all that discussion, Defendants miss the boat entirely about whether there is a viable claim for malicious prosecution here under Section 1983—there clearly is under First Circuit precedent. As identified above, the First Circuit has expressly countenanced malicious prosecution lawsuits under § 1983 since at least 1990. In order to prevail on such a claim, a plaintiff must establish that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor. *Hernandez-Cuevas*, 723 F. 3d at 100-101. Whatever the source of such a claim (Defendants ultimately reach the correct conclusion that it properly lies under the Fourth Amendment), the fundamental showing has consistently been that a plaintiff has to show that he was subjected to criminal proceedings despite the lack of probable cause. Here, Plaintiff's Complaint brings him squarely within the bounds of that claim under the Fourth Amendment. Because his Complaint states a viable claim, there is no basis to dismiss the malicious prosecution under Section 1983.

### E.  PLAINTIFF IS NOT PRECLUDED FROM BRINGING HIS FABRICATION AND SUPPRESSION OF EVIDENCE CLAIMS HERE

To be clear, no court has ruled on whether Defendants fabricated eyewitness identification evidence or suppressed evidence in an effort to frame Plaintiff for Daniel Rodriguez' murder.  Given that, it is difficult to understand what Defendants Garvin, Hollow, Rowe, Roach, and Zuk are arguing when they claim that Plaintiff's claims are precluded by a prior (cursory) state court decision that simply found that one of the photo arrays was not unduly suggestive— *Commonwealth v. Echavarria*, 428 Mass. 593, 596 (1998).  Doc. 49 at 24-25; Doc. 52 at 17-18; Doc. 57 at 11-12; 59 at 4-5; Doc. 79 at 12-13.

To Plaintiff, it is shameful to argue that he is precluded from bringing claims that Defendants intentionally fabricated eyewitness identification and then hid evidence of the fabrication by relying on one of the fruits of that misconduct in the first place. Regardless, Plaintiff's due process claims are not premised on the suggestive identification procedures themselves, but on the fabrication of the false identification behind the scenes and then hiding the evidence of the fabrication.

Because the claims are based on different bases, claim preclusion has no place here. Claim preclusion prohibits parties from contesting issues that they have had a "full and fair opportunity to litigate." *Taylor v. Sturgell*, 553 U.S. 880, 892, (2008). There are three elements for claim preclusion to apply: "(1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related." *Airframe Sys., Inc. v.*

*Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010). The decisions of state courts, as well as federal courts, can have a preclusive effect. *Willhauck v. Halpin*, 953 F.2d 689, 704 (1st Cir. 1991).

Here, the second element is sorely lacking. Whether one photo array was unduly suggestive (the sole basis for Defendants claim preclusion arguments) is in no way identical or sufficiently related to Plaintiff's claims here about the fabrication of eyewitness identification and the suppression of that fabrication. Those claims were simply not litigated. Although evidence of that one photo array may be relevant to the larger claim, Plaintiff's claim in no way stems only from that one photo array. This is not a claim preclusion case.

## F.  PLAINTFF SUFFICIENTLY PLEADS A SECTION 1983 CLAIM FOR FAILURE TO INTERVENE

Defendants, who all jointly investigated the Rodriguez murder, participated in a conspiracy to deprive Plaintiff of his constitutional rights and failed to intervene to stop it as it was happening. Defendants move to dismiss Count IV, which alleges that the Defendants failed to intervene to stop the constitutional harms inflicted on Plaintiff, based on the claim that failure to intervene claims are limited only to excessive force or bodily integrity cases. Doc. 49 at 19-20; Doc. 52 at 13-14; Doc. 55 at 13-14; Doc. 57 at 11; Doc. 59 at 9; Doc. 79 at 9-10. Defendants too narrowly read the law on failure to intervene.

Failure to intervene or bystander liability is premised on a law enforcement officer's continuous duty to uphold the law, even if it is the officer's colleague who is violating the law. Therefore, if a bystanding officer (1) is confronted with a fellow

officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly. *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (4th Cir. 2002) (officers could be liable as bystander to wrongful seizure and detention) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (bystander liability allowed for failing to stop fellow officer from wrongly detaining citizen); *Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982) (officer liable for failing to intervene in false arrest).

Defendants all assert that a bystander liability claim is limited only to excessive force cases. There is no case that expressly limits bystander liability only to excessive force or bodily integrity cases. In fact, the cases from the courts of appeals cited above involve bystander liability outside of the excessive force context. Defendants' request to limit failure to intervene liability has no basis.

Similarly, Defendant Cooney's request to be protected by qualified immunity should fail. Cooney's argument is that it was not clearly established at the time that he could not passively allow constitutional violations to occur. Putting aside that such tacit agreement could be an independent basis for conspiracy liability, the source of the qualified immunity analysis stems from the constitutional violation itself.  Failure to intervene is a pathway to liability, not the underlying constitutional violation. Hence, the question is not whether bystander liability was clearly established, but whether it was clearly established that a law enforcement officer could fabricate inculpatory evidence and suppress exculpatory evidence in an

effort to bring criminal charges against someone for whom there was not probable cause to do so.[5] As stated above, the answer to those questions is yes.

Plaintiff states valid claims of failure to intervene liability. Such liability applies in claims of constitutional violations, not just those related to excessive force. Moreover, any qualified immunity analysis for failure to intervene liability hinges on whether the underlying constitutional right was clearly established, not on the theory of whether bystander liability was clearly established.

## G. PLAINTIFF SUFFICIENTLY PLEADS CLAIMS OF STATE LAW MALICIOUS PROSECUTION

As with his federal malicious prosecution claim, Plaintiff's claim under Massachusetts law for malicious prosecution is viable. Defendant Cooney claims that Plaintiff has not alleged that he instituted criminal process against him with malice. He misreads Plaintiff's Complaint. Plaintiff expressly pleads both of those elements against all Defendants. Doc. 1 at ¶¶108-110.

To the extent that Defendant Cooney is arguing that the measure of probable cause is based only on what was presented to the criminal court in 1996, this argument would be unavailing because Plaintiff's Complaint, which must be accepted as true, outlines the ways that Defendants framed Plaintiff in that proceeding and rendered the legal proceedings against him unfair in violation of his Fourteenth Amendment rights. *See Williams*, 771 F. Supp. 2d at 206-07.

---

[5] Defendant Cooney cites to *Walker v. Jackson*, 952 F. Supp. 2d 343, 350-52 (D.Mass 2013), to support his qualified immunity theory. Although *Walker* is not controlling here, Plaintiff also asserts that it focused its analysis on the wrong issue of what the clearly established law demonstrated. The focus should have been on whether the substantive violation was clearly established, not whether bystander liability was clearly established.

Under Massachusetts law, to prove malicious prosecution, Plaintiff must establish that "(1) [he was] damaged because the defendants commenced the criminal prosecution without probable cause; (2) that they did so with malice or improper purpose, and (3) that the criminal action terminated in [his] favor." *Id.* at 206 (quoting *Afreedi v. Bennett*, 517 F. Supp. 2d 521, 540 (D.Mass. 2007)). Like here, in *Williams*, the defendants argued that the plaintiff failed to plead sufficient facts to state a claim for malicious prosecution. This court disagreed, noting that the complaint there sufficiently alleged that the conviction was obtained by the defendants' false testimony and as a result of a conspiracy between the defendants to deprive him of his constitutional rights. *Id.*

The *Williams* court also rejected the defendants' argument that the plaintiff failed to allege that the criminal proceedings against him were initiated for an improper purpose. *Id.* The court concluded that, "Proof of improper motive requires proof that [the defendant] acted primarily for a purpose other than that of properly carrying out his duties, or was attempting to achieve an unlawful end or a lawful end through unlawful means, or intended to harass, vex, or annoy the Plaintiff [ ]." *Id.* (quoting *Afreedi*, 517 F. Supp. 2d at 540). The court reasonably inferred the officers were acting for an improper motive based on the plaintiff's claim that the officers initiated criminal proceedings against him without any evidence that he had committed a crime. *Id.* Those same conclusions apply here.

### H. PLAINTIFF SUFFICIENTLY PLEADS A CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff's intentional infliction of emotional distress claim against Defendants is one that courts in this District and Circuit have previously recognized as actionable under Massachusetts law. Nevertheless, Defendant Cooney claims that Plaintiff fails to allege a viable factual claim. Doc. 55 at 16-17. As noted below, the law does not support Cooney.

To sustain a claim of intentional infliction of emotional distress, under Massachusetts law, a plaintiff must show: (1) that a defendant "intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Bazinet v. Thorpe*, 2016 WL 3149657 at *7 (D. Mass. June 3, 2016) (citing *Polay v. McMahon*, 468 Mass. 379, 10 N.E.3d 1122, 1128 (2014)). *See also Barbosa v. Conlon*, 962 F. Supp. 2d 316, 333 (D.Mass. 2013).

To be considered extreme and outrageous, the defendant's conduct must go "beyond all possible bounds of decency, and [be] regarded as atrocious, and utterly intolerable in a civilized community." *Bazinet*, 2016 WL 3149657 at *7 (quoting *Polay*). "Police officers fabricating evidence in an effort to obtain criminal charges against an innocent citizen . . .would be sufficient to meet the high standard for a claim of IIED." *Id.* (citing *Limone v. United States*, 497 F. Supp. 2d 143, 227 (D.Mass.2007) (finding that framing of innocent men by law enforcement officials

was extreme and outrageous conduct for purposes of intentional infliction of emotional distress)).

Since Plaintiff here asserts the same claims against Cooney that the courts in *Bazinet* and *Limone* found to be sufficient to bring an intentional infliction of emotional distress, there is no basis for Cooney's motion to dismiss this claim.

## I.   DISMISSAL OF PLAINTIFF'S NEGLIGENCE CLAIMS IS PREMATURE

Plaintiff's negligence claims against all Defendants fall under the Massachusetts Tort Claims Act ("MTCA"). Mass. Gen. Laws ch. 258, § 1, *et seq*. The MTCA creates a mechanism for municipal liability when municipal employees are negligent and cause damages. *Id*. The MTCA makes the municipality liable for the acts of its employees (Section 2), and requires a claimant to present his claims to the municipality within two years of when the claim is known. *Id*. at § 4. Defendants all ask for Plaintiff's negligence claims to be dismissed under the MTCA. 1. Doc. 49 at 27-30; Doc. 52 at 19-20; Doc. 55 at 15; Doc. 57 at 14; Doc. 59 at 9-10; Doc. 79 at 15. Plaintiff asks the Court to find that dismissal at this stage is premature.

### 1.   The Individual Defendants are not Entitled to Automatic Dismissal

Plaintiff concedes that the MTCA framework typically substitutes a government entity as the individual defendant based on claims of its employees acting in the scope of employment. Plaintiff further agrees that his claims against the individual Defendants stem from their actions taken by them in the scope of their employment. Under the MTCA, therefore, Lynn could be the sole liable party:

> [p]ublic employers shall be liable for injury . . . caused by the negligent or
> wrongful act or omission of any public employee while acting within the scope
> of his office or employment, in the same manner and to the same extent as a
> private individual under like circumstances. . . .

Mass. Gen. Laws ch. 258, § 2. Thus, Lynn "could be liable under [the MTCA] for the

negligence of defendant officers acting within the scope of their duty." *Williams*, 771

F. Supp. 3d at 199 (quoting *Lewis v. Kendrick*, 944 F.2d 949, 953 (1st Cir. 1991).

But the MTCA does not automatically foreclose actions against individual

government employees. Rather, it requires government employees to cooperate in

any defense. If they do not, then they may be liable individually:

> a public employee shall provide reasonable cooperation to the public
> employer in the defense of any action brought under this chapter.
> Failure to provide such reasonable cooperation on the part of a public
> employee shall cause the public employee to be jointly liable with the
> public employer, to the extent that the failure to provide reasonable
> cooperation prejudiced the defense of the action.

Mass. Gen. Laws ch. 258, § 2.

Defendants have not stated to what extent the individual Defendants will

reasonably cooperate with the City of Lynn. Until such time as it is clear that the

individual Defendants have reasonably cooperated with the public employer, it

would be premature to dismiss Plaintiff's claims against the individual Defendants

under the MTCA.

### 2. For Judicial Economy, Plaintiff Asks the Court to Defer Dismissing the Negligence Claims Against the City of Lynn

The City of Lynn is correct that Plaintiff first presented his claim to it on

June 14, 2016, and that it has not run six months yet, as required by Section 4 of

the MTCA for Plaintiff to bring his negligence claims.  But for the sake of judicial

economy, Plaintiff asks the Court to not dismiss his claims since that six month period will run in a little over one week. This Court may defer Plaintiff's negligence claims against the City of Lynn because presentment under Section 4 is not jurisdictional. *Krasnow v. Allen*, 29 Mass.App.Ct. 562, 562 N.E.2d 1375 (1990), *review den'd* 409 Mass. 1102, 566 N.E.2d 1131 (1991).

This request is especially important because Defendant City of Lynn also seeks to dismiss Plaintiff's negligence claims against it based on a vague statute of limitations argument. It is possible that the timeframe that Defendant City of Lynn is arguing would place Plaintiff's claims outside of the statute of limitations for purposes if he had to refile his claims at the end of the presentment period. In order to streamline this case, Plaintiff asks the Court to defer dismissing Plaintiff's negligence claims against Defendant City of Lynn during the nine days until his presentment shall be completed under the MTCA.

### 3.  Plaintiff's Negligence Claims Against the City of Lynn are Timely

Plaintiff's Complaint supports that his negligence claims against the City of Lynn are timely in that he did not discover Defendants' misconduct as alleged more than three years before he filed his complaint.[6] Under Massachusetts law, Plaintiff's negligence claims accrued on the date of the injury or the date that he discovered the cause of action. *See Doe v. Harbor Schs., Inc.*, 446 Mass. 245, 843 N.E.2d 1058, 1060-61 (2006). Under the MTCA, he was required to bring his claims

---

[6] Defendants can point to nothing in Plaintiff's Complaint to establish that it forecloses his state law claims under the applicable three year statute of limitations.

within three years of discovering Defendants' negligence. Mass. Gen. Laws ch. 258, § 4.

Defendant City of Lynn claims that Plaintiff's negligence claims are untimely and cites to docket sheets that show activity from Plaintiff's appeal of his criminal case as purported substantive evidence to support that contention. Doc. 49 at 29-30. It uses these docket sheets to somehow argue that Plaintiff should have known about his negligence claims. *Id.* But those docket sheets say no such thing and this Court is limited, at most, to only take judicial notice of the existence of the submissions identified on the docket sheets, not any substance or inferences from those filings.

The Supreme Court has said that courts considering a motion under Rule 12(b)(6) can consider the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). Under Federal Rule of Evidence, courts may take judicial notice of the existence of public records, but not of facts within those records. *Freeman v. Town of Hudson,* 714 F.3d 29, 36 (1st Cir. 2013). The reason is that "many documents in the possession of public agencies simply lack any indicia of reliability whatsoever." *Id.* Substantive documents (presumably what Defendant City of Lynn is relying on) "are unlike official records, such as birth or death certificates and other similar records of vital statistics." *Id.* Therefore, the use of any public record in deciding a motion to dismiss is a narrow exception. *Alharbi v. Beck,* 62 F. Supp. 3d 202, 209 (D.Mass.

2014) (finding that only the existence, but not the findings, of a legislative report can be considered in deciding a motion to dismiss).

Absent Defendant's conjecture about what the docket report means, there is no basis to dismiss Plaintiff's negligence claims based on a statute of limitations argument.

## J.  PLAINTIFF SUFFICIENTLY PLEADS CLAIMS UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT

Plaintiff sufficiently pleads claims against Defendants under the Massachusetts Civil Rights Act ("MCRA"). Defendants Garvin, Hollow, Rowe, and Zuk move to dismiss this claim, alleging Plaintiff did not sufficiently plead the elements. Doc. 49 at 25-26; Doc. 52 at 19; Doc. 57 at 13-14; Doc. 59 at 10-11; Doc. 79 at 14-15. They have misread Plaintiff's Complaint.

The MCRA "'provides a cause of action against a person who has "'interfere[d] by threats, intimidation or coercion' with the exercise of rights secured by the state or federal constitutions or laws." *Bazinet*, 2016 WL 3149657 at *6 (quoting Mass. Gen. Laws ch. 12, §§ 1 lH, 111). In order to establish a claim under the MCRA, a plaintiff "must prove that (1) [his or her] exercise [or] enjoyment of rights secured by the Constitution or the laws of either the United States or the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." *Id.* (citing *Roman v. Trustees of Tufts Coll.*, 461 Mass. 707, 964 N.E.2d 331, 337 (2012)). To be actionable, a defendant's actions must amount to "an attempt to force someone to do something the person is not lawfully required to do." *Id.* (citing

55

*Freeman v. Planning Bd. of W Boylston*, 419 Mass. 548, 646 N.E.2d 139, 149 (1995)).

For purposes of the MCRA, a "threat" is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Id.* (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 631 N.E.2d 985, 990 (Mass.1994)). "Intimidation" involves putting a person "in fear for the purpose of compelling or deterring conduct." *Id.* "Coercion" means "the application to another of such force, either physical or moral, as to constrain [her] to do against [her] will something [she] would not otherwise have done." *Id.*

Plaintiff's MCRA claim here sufficiently pleads these elements as to each Defendant. Doc. 1 at ¶¶127-128. Moreover, the facts of the Complaint, read with all reasonable inferences in favor of Plaintiff, fully support that his claims encompass Defendants' attempts to force the witnesses against Plaintiff to give false eyewitness testimony and that they used intimidation and coercion to do so. Doc. 1. "Threatening, intimidating, or coercive actions directed at third parties should be included in considering any conduct that forms the basis of a claim under the civil rights act." *Id.* (citing *Haufler v. Zotos*, 446 Mass. 489, 845 N.E.2d 322, 334 (2006)). Plaintiff's claims under the MCRA are viable.

### K. "GOOD FAITH" IMMUNITY DOES NOT SHIELD DEFENDANTS FROM THE STATE LAW CLAIMS

Similar to Plaintiff's position in opposition to Defendants' qualified immunity arguments (which has its own good faith element), Plaintiff's Complaint precludes any finding of "good faith" immunity. There is simply no room for good faith

immunity for Defendants, who knowingly fabricated eyewitness evidence against Plaintiff, used that evidence to frame Plaintiff, suppressed the facts of the fabrication, and then sought to institute criminal proceedings against Plaintiff without probable cause.  Nevertheless, Defendants Garvin, Hollow, and Rowe allege good faith in framing Plaintiff. Doc. 49 at 32-34; Doc. 52 at 22-23; Doc. 57 at 14-15; Doc. 79 at 17-18.

The absurdity of claiming good faith in response to intentionally framing an innocent man was readily explained by the court in *Limone v. United States*, 497 F. Supp. 2d 143, 220 (D.Mass. 2007). In noting that actions taken in good faith insulate the actor from malicious prosecution liability (citing *Beecy v. Pucciarelli*, 387 Mass. 589, 441 N.E.2d 1035, 1039 n.9 (1982)), the court explained that the analysis of good faith in a wrongful conviction case focuses on whether unlawful actions were taken knowingly:

> [T]he malice necessary to be shown in order to maintain this [malicious prosecution] action, is not necessarily revenge or other base and malignant passion. Whatever is done willfully and purposely, if it be at the same time wrong and unlawful, and that known to the party, is in legal contemplation malicious. That which is done contrary to one's own conviction of duty, or with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means, or, in the language of the charge, to do a wrong and unlawful act knowing it to be such, constitutes legal malice.

*Id.* (quoting *Wills v. Noyes*, 29 Mass. 324, 12 Pick. 324, 328 (1832)). *See also Seelig v. Harvard Coop. Society*, 355 Mass. 532, 246 N.E.2d 642, 646 (1969) (finding of want of probable cause is a sufficient basis from which to infer malice).

The court in *Limone* then went on to eviscerate any claim of good faith in framing an innocent man, which is what Plaintiff's complains of here:

> Malice has plainly been shown in this record. The FBI wanted LCN members taken down for Deegan's murder; they congratulated themselves when Limone and Tameleo were initially sent to their deaths, with Greco and Salvati as collateral damage. And in the evidence introduced at this bench trial, Rico and Condon lied about what they knew and when they knew it. They were indifferent to the outcome of the Deegan case. Either way, they threw away the liberty of these four men with wilful disregard for their rights. Their actions were purposeful and unlawful. If anything shocks the conscience, it is this behavior.

*Limone*, 497 F. Supp. 2d at 220.

Plaintiff's claims against Defendants here are equally shocking. "Good faith" immunity has no place in this case.

## L.  PLAINTIFF AGREES THAT HIS INTENTIONAL TORTS CLAIMS ARE PLED ONLY AGAINST THE INDIVIDUAL DEFENDANTS

Plaintiff agrees that his intentional tort claims under Massachusetts law are brought only against the individual Defendants and do not lie against Defendant City of Lynn. *Opalenik v. LaBrie*, 945 F. Supp. 2d 168, 195 (D.Mass. 2013).

## M. PLAINTIFF'S *RESPONDEAT SUPERIOR* AND INDEMNIFICATION CLAIMS ARE VIABLE

Plaintiff properly alleges a viable indemnification claim. Under the MTCA, Defendant City of Lynn may be a town that has agreed to indemnify its employees:

> Any . . . town which accepts this section in the manner hereinafter provided in this section [2] shall indemnify and save harmless municipal officers, elected or appointed from personal financial loss and expense including reasonable legal fees and costs, if any, in an amount not to exceed one million dollars, arising out of any claim, demand, suit or judgment by reason of any act or omission, except an intentional violation of civil rights of any person, if the official at the

time of such act or omission was acting within the scope of his official duties or employment.

General Laws ch. 258, § 13. Plaintiff will need to pursue discovery to determine to what extent the City of Lynn has accepted that indemnification statute.

Plaintiff, however, agrees with Defendant City of Lynn that it is liable for the negligent torts of its employees under the MTCA, and that *respondeat superior* is, therefore, not a necessary stand-alone claim.

Dated: December 5, 2016

RESPECTFULLY SUBMITTED,

ANGEL ECHAVARRIA

By: /s/ Mark Loevy-Reyes

*One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Arthur Loevy*                    Ruth Greenberg
Jon Loevy*                       505 Paradise Rd., #166
Debra Loevy              Swampscott, MA 01907
Mark Loevy-Reyes*          (781) 632-5959
Steven Art*                      ruthgreenberg44@aol.com
LOEVY & LOEVY            Bar No. 563783
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
steve@loevy.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on December 5, 2016, I filed the foregoing PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS using the Court's CM/ECF system, which effected service on all counsel of record listed below.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*

| | |
|---|---|
| Arthur Loevy* | Ruth Greenberg |
| Jon Loevy* | 505 Paradise Rd., #166 |
| Debra Loevy-Reyes* | Swampscott, MA 01907 |
| Mark Loevy-Reyes* | (781) 632-5959 |
| Steven Art* | ruthgreenberg44@aol.com |
| LOEVY & LOEVY | Bar No. 563783 |

311 N. Aberdeen St.

Third Floor

Chicago, IL 60607

(312) 243-5900

(312) 243-5902 (fax)

steve@loevy.com

*Admitted *pro hac vice*

*Attorneys for Defendant Zuk*

Brian Rogal

Rogal & Donnellan, P.C.

100 River Ridge Drive

Norwood, MA 02062

(781) 255-1200

brogal@rogalanddonnellan.com


*Attorneys for Defendant Garvin*

Thomas P. Campbell

Thomas P. Campbell, P.C.

8E Pleasant Street

South Natick, MA 01760

(508) 545-1820

t.campbell@tpc-law.com


*Attorneys for Defendant Cooney*

Joseph P. Kittredge

Margaret A. Rubino

One Keefe Road

Acton, MA 01720

(978) 369-6001

jkittredge@rkpclaw.com

mrubino@rkpclaw.com


*Attorneys for Defendant Rowe*

Michael J. Akerson

Reardon, Joyce & Akerson, P.C.

4 Lancaster Terrace

Worcester, MA 01609

(508) 754-7285

akerson@rja-law.com


*Attorneys for Defendants City of Lynn and Hollow*

Thomas R. Kiley

John R. Hitt

Cosgrove, Eisenberg & Kiley, P.C.

One International Place

Suite 1820

Boston, MA 02110

(617) 439-7775

tkiley@ceklaw.net

jhitt@ceklaw.net