UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANGEL ECHAVARRIA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 16-cv-11118-ADB |
| | * | |
| J. MICHAEL ROACH et al., | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Angel Echavarria ("Plaintiff") brings this case pursuant to 42 U.S.C. § 1983, Mass. Gen. Laws ch. 12, § 11I, and Massachusetts state common law, alleging that Defendants—the City of Lynn (the "City"), former officers of the City of Lynn Police Department, and former officers of the Massachusetts State Police (the "MSP")—violated his civil rights by engaging in unlawful conduct during the investigation that led to his now-vacated conviction for first-degree murder.  Currently pending before the Court are six motions for summary judgment filed by the City; John Hollow; Russell Gokas, Raymond Guillermo, Charles Luise, J. Michael Roach, Joseph Rowe, and John Scannell (collectively, the "Lynn Police Officers"); John Garvin; Michael Cooney; and Norman Zuk.  [ECF Nos. 276 (City), 277 (Hollow), 279 (Lynn Police Officers), 280 (Garvin), 290 (Cooney), 292 (Zuk)].  For the reasons set forth below, Zuk's, Cooney's, Rowe's, Luise's, Scannell's, and Gokas's motions for summary judgment are GRANTED.  Hollow's, Garvin's, Roach's, Guillermo's, and the City's motions are GRANTED in part and DENIED in part.

# I.      BACKGROUND

## A.      Defendants' Objections

Defendants have filed "Rule 56(c)(2) Objections" objecting to or, in the alternative,

moving to strike portions of Plaintiff's statement of facts as well as exhibits submitted in support

of his opposition to summary judgment.  [ECF No. 332].  Plaintiff did not respond to these

objections.  Federal Rule of Civil Procedure 56(c)(2) allows a party to object to material cited in

support of a disputed fact if that material "cannot be presented in a form that would be

admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Because the objections affect the factual

record to be considered when ruling on the summary judgment motions, the Court addresses

them first.

The parties' statements of material facts are "useful devices for focusing a district court's

attention on what is—and what is not—genuinely controverted."  Calvi v. Knox Cnty., 470 F.3d

422, 427 (1st Cir. 2006).  "But unless the statement is admitted, the court is required to evaluate

the facts by reference to the record."  Inman v. Siciliano, No. 10-cv-10202, 2012 WL 1980408,

at *5 (D. Mass. May 31, 2012).

### 1.      Argumentative, Conclusory, and/or Opinion

Defendants object to dozens of the paragraphs and headings in Plaintiff's statement of

facts as argumentative, conclusory, or based on opinion.  [ECF No. 332 at 3–4].  When ruling on

a motion for summary judgment, the Court "safely may ignore 'conclusory allegations,

improbable inferences, and unsupported speculation.'"  Cochran v. Quest Software, Inc., 328

F.3d 1, 6 (1st Cir. 2003) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8

(1st Cir. 1990)).  Though the Court does not agree that every paragraph identified by Defendants

is properly characterized in this way, to the extent Plaintiff's statements are speculative,

conclusory, or argumentative, they have not been relied upon in deciding the motions for summary judgment.  And, as noted above, because these portions of the statement of facts are disputed, the Court will look to the evidentiary support and make its conclusions from the record, drawing all inferences in the non-moving party's favor.

### 2.    Statements Not Supported by Citation

Defendants again object to dozens of paragraphs and all of the headings in Plaintiff's statement of facts because Plaintiff: (1) cites to evidence that does not actually support the alleged fact; (2) does not cite to anything at all; (3) cites to an exhibit not before the Court; or (4) does not cite to a specific page number in a multi-page exhibit.  [ECF No. 332 at 3–4, 6–7].  At the summary judgment stage, unsupported allegations need not be credited and the Court has not relied on any purported facts that are not supported by materials in the record when ruling on the pending motions.  See Cochran, 328 F.3d at 6.  Any heading that does not contain a citation to the record will not be afforded any evidentiary weight.  Amoah v. McKinney, 14-cv-40181, 2016 U.S. Dist. LEXIS 191864, at *31 (D. Mass. Sept. 2, 2016).  Finally, the Court cannot rely on exhibits that are not before it, so to the extent portions of Plaintiff's statement of facts are supported only by material that is not in the record, those factual allegations are unsupported and the Court has not relied on them.

### 3.    Inadmissible Hearsay

Defendants move to strike various paragraphs or portions of paragraphs because they are either inadmissible hearsay or rely exclusively on inadmissible hearsay.  [ECF No. 332 at 4–5]. While it is true that "hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted[,]" Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 12 (1st Cir. 2016) (internal quotation marks and citations omitted), Defendants largely do not explain how

the paragraphs they have moved to strike rely on only inadmissible hearsay.  For example, in objecting to paragraph 129, Defendants state only that "[t]o the extent Plaintiff relies upon Exhibit 165 it is an inadmissible hearsay statement."  [ECF No. 329 ¶ 29].  Absent any analysis, the Court cannot make a well-reasoned determination about what portion of Plaintiff's statement of facts should be stricken as inadmissible hearsay or whether the evidence could nonetheless be properly introduced at trial.  Cf. Int'l Shipping Agency, Inc. v. Union de Trabajadores de Muelles Loc. 1740, No. 12-cv-01996, 2015 WL 5022794, at *3 (D.P.R. Aug. 21, 2015) (rejecting objection based on improper authentication because "[p]ursuant to Rule 56(c)(2), an objection must state that the movant's evidence '*cannot* be presented in a form that would be admissible' at trial" (quoting Fed. R. Civ. P. 56(c)(2))).  Accordingly, the Court will not strike these paragraphs.

4.   Statements Not Based on Personal Knowledge

Defendants object to or move to strike the affidavits and reports of Plaintiff's expert witnesses, Dr. Timothy Longo and Dr. Jennifer Dysart, and any paragraphs in Plaintiff's statement of facts that rely on those documents because they are not based on personal knowledge.  [ECF No. 332 at 5–6, 9].  "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fin. Res. Network, Inc. v. Brown & Brown, Inc., 867 F. Supp. 2d 153, 171 (D. Mass. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).  In the case of an expert affidavit, however, "[a]n expert who provides an affidavit with an opinion formed within his area of expertise and based on his own assessment or analysis of the underlying facts or data satisfies the personal knowledge requirement . . . ."  Marine Polymer Techs., Inc. v. HemCon, Inc., No. 06-cv-00100, 2009 WL 801826, at *1

(D.N.H. Mar. 24, 2009) ("To the extent [defendant] contends that an expert's affidavit must state

that it is based on his personal knowledge, that theory is unsupported."); see also 4 MVR, LLC v.

Warren W. Hill Constr. Co., Inc., No. 12-cv-10674, 2016 WL 4775451, at *7 (D. Mass. Sept. 13,

2016) ("[T]o the extent an affiant is a qualified expert, her testimony need not be based on

personal knowledge." (quoting Fraser & Wise, P.C. v. Primarily Primates, Inc., 966 F. Supp. 63,

69 (D. Mass. 1996))).

Accordingly, the Court will not strike these expert affidavits or the portions of Plaintiff's

statement of facts that rely on them on personal knowledge grounds.

### 5.    Beyond the Scope of the 30(b)(6) Notice

Defendants object to two paragraphs of Plaintiff's statement of facts that cite to portions

of a Federal Rule of Civil Procedure 30(b)(6) witness's deposition transcript because the

testimony elicited was beyond the scope of the 30(b)(6) notice.  [ECF No. 332 at 7].  The Court

does not rely on those portions of the deposition transcript in reaching its ruling, and Defendants'

request to strike or disregard those paragraphs is moot.

### 6.    Non-Material Facts

Defendants ask the Court to strike or disregard portions of Plaintiff's statement of facts

that are non-material and therefore irrelevant to the outcome of the suit.  [ECF No. 332 at 7–8].

If a fact is not material, then it cannot be a basis for precluding summary judgment because the

purpose of summary judgment is to determine whether disputes of material fact exist.  Fed. R.

Civ. P. 56(a) (explaining that summary judgment is appropriate where the moving party can

show that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law").  Defendants, however, cite to no support for their statement that

"[a]ll non-material facts should be disregarded [or] stricken as they serve no purpose at the

summary judgment stage." [ECF No. 332 at 8]. Accordingly, the Court will not strike the portions of Plaintiff's statement of facts that contain "non-material" facts, but, as explained above, disputes of non-material fact are not a basis for precluding summary judgment.

7.    <u>Exhibits</u>

Finally, Defendants ask the Court to strike scores of Plaintiff's exhibits because they are: (1) inadmissible hearsay; (2) inadmissible opinion; (3) not based on personal knowledge; or (4) in a foreign language without an English translation. [ECF No. 332 at 8–9]. The Court will strike the two exhibits that are in Spanish without any certified translation, Exhibits 85 and 93. [ECF No. 307-27; ECF No. 307-35].

As to the objections lodged against the other exhibits, Defendants have simply listed the exhibits they contend should be stricken with, at most, a few words of explanation. Without the benefit of a reasoned explanation beyond assertions that exhibits contain "inadmissible hearsay," "inadmissible opinion," or "personal knowledge," the Court cannot make a well-reasoned decision as to whether the myriad exhibits that Defendants seek to strike should be considered at this stage of the case. Further, as explained above, the objection contemplated under Rule 56(c)(2) is that the evidence objected to could not be submitted in an admissible form at trial, which Defendants' Rule 56(c)(2) objections do not address. Accordingly, with the exceptions of Exhibits 85 and 93, Defendants' request to strike Plaintiff's exhibits is <u>DENIED</u> with leave to renew these objections at a later time if necessary.

### B.    Factual Background[1]

While the parties agree that certain basic events took place, they dispute many key facts and the inferences that should be drawn from the evidence before the Court.  Because Defendants have moved for summary judgment, the Court, as it must, reviews the evidence in the light most favorable to Plaintiff, who opposes summary judgment, and indulges all reasonable inferences in his favor.

### 1.    The Murder

On January 7, 1994, at around 7:30 p.m., Daniel Rodriguez was shot and killed in Apartment 403 at 501 Washington Street, Lynn, Massachusetts (the "Apartment").  [ECF No. 329 ¶ 3].  The Apartment was rented by Daniel's brother, Otilio Rodriguez, who lived there with his girlfriend and Daniel's other brother, Isidoro Rodriguez.[2]  [Id.].  Otilio, who sold cocaine from the Apartment, had left Lynn to visit the Dominican Republic approximately two months before the murder.  [ECF No. 308-31 at 33; ECF No. 329 ¶ 3].  While Otilio was away, Isidoro and Orlando Polanco, a family friend, were staying at the Apartment.  [ECF No. 329 ¶ 3].

On the night of the murder, Daniel visited Isidoro at the Apartment.  [ECF No. 329 ¶ 4]. While he was there, two armed men broke into the Apartment and tied Isidoro up.  [ECF No. 287 ¶ 10; ECF No. 329 ¶ 4].  One of the intruders then forced Daniel into the bathroom, where he

---

[1]The facts are drawn from Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts, [ECF No. 287], Defendants' Joint Reply to Plaintiff's Concise Statement of Facts, [ECF No. 329], and the documents cited therein.  Plaintiff did not file a response to Defendants' joint statement of facts, and, pursuant to the Court's March 10, 2021 Order, [ECF No. 319], any fact in Defendants' Joint Local Rule 56.1 Concise Statement of Undisputed Material Facts that is not specifically controverted by Plaintiff is deemed admitted.

[2] The Court will refer to Daniel Rodriguez, Isidoro Rodriguez, Otilio Rodriguez, and Juan Rodriguez by their first names to avoid confusion.

was shot twice in the back of the head with a 9-millimeter gun.  [ECF No. 287 ¶ 1; ECF No. 329 ¶ 3].

        2.      The Lynn Police Department, the District Attorney, and the Individual Defendants

Although Daniel was murdered in Lynn, pursuant to a state statute, the District Attorney for Essex County, rather than the Lynn Police Department, was in charge of the investigation. [ECF No. 287 ¶ 234]; Mass. Gen. Laws ch. 38, § 4 ("The district attorney or his law enforcement representative shall direct and control the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred.").  Accordingly, the District Attorney's office controlled, directed, and supervised the investigation of Daniel's homicide.  [ECF No. 287 ¶ 236].  The District Attorney's office worked with the MSP's Crime Prevention and Control Unit ("CPAC unit") to carry out the investigation.[3]  [Id. ¶ 237].  The Lynn Police Department and its officers assisted the District Attorney's office and the MSP with the investigation.  See [id. ¶ 240 (explaining that Lt. Roach assisted the MSP and the District Attorney's office)].

The ten individual defendants in this case all worked for the Lynn Police Department or the MSP, and each had varying levels of involvement in the investigation of Daniel's homicide.[4] A brief summary of each defendant's role follows:

- Garvin: Garvin was a co-lead investigator on Daniel's homicide case.  [ECF No. 329 ¶ 8]. He was a Sergeant with the MSP, assigned to the CPAC unit for Essex County.  [ECF No. 287 ¶ 18].  He worked for the MSP until 2007.  [Id. ¶ 566].
- Roach: Roach was the other co-lead investigator.  [ECF No. 329 ¶ 8].  He was assigned to the investigation by Rowe.  [ECF No. 287 ¶ 25; ECF No. 329 ¶ 8].  Roach was a

_____

[3] During the relevant time period, the MSP assigned a CPAC unit to the office of each District Attorney.  [ECF No. 287 ¶ 23].  A CPAC unit's duties included assisting with investigations into the death of a human being, under the direction of the District Attorney.  [Id.].

[4] The term "individual defendants" collectively refers to Garvin, Roach, Hollow, Guillermo, Rowe, Scannell, Luise, Gokas, Zuk, and Cooney.

Lieutenant in the Lynn Police Department from 1991 until 1996, when he was promoted to Captain. [ECF No. 287 ¶ 486]. He retired in 2009. [Id.].

- Hollow: Hollow was the Lynn Police Department's Chief of Police from 1987 until 2000. [Id. ¶ 364].
- Guillermo: Guillermo was a Lynn police officer who worked as a patrol officer from 1986 until 2015, when he retired. [Id. ¶ 436].
- Rowe: Rowe was made a Captain in the Lynn Police Department in 1992. [Id. ¶ 533]. He worked in the Criminal Investigative Division and retired in 2008. [Id.]. As a Captain, Rowe reviewed police reports prepared by the patrol division. [ECF No. 305-19 at 62].
- Scannell: Scannell was a Sergeant in the Lynn Police Department. [ECF No. 287 ¶ 516]. He retired in 2020. [Id. ¶ 515].
- Luise: Luise was a Lynn police officer who worked as a patrol officer from 1991 until 2002. [Id. ¶ 467]. He now works for the MSP. [Id. ¶ 468].
- Gokas: Gokas was a Lynn police officer who worked as a patrol officer from 1986 until 2019, when he retired. [Id. ¶ 455].
- Zuk: Zuk was a former MSP trooper assigned to the Essex County CPAC unit. [Id. ¶ 27]. He passed away after this case was filed. [Id. at 30 n.11].
- Cooney: Cooney was also an MSP trooper assigned to the Essex County CPAC unit. [Id. ¶ 27].

### 3.  Processing the Crime Scene

Two Lynn Police Department patrol officers, Officer Scott Wakeham and Officer Stephen Whitrow, were the first to arrive to the murder scene. [ECF No. 287 ¶ 13; ECF No. 329 ¶ 6]. These officers discovered Daniel's body and called for back-up. [ECF No. 287 ¶ 14; ECF No. 329 ¶ 6]. Once back-up arrived, Officer Wakeham was assigned to stand at the Apartment doorway and record who arrived at the scene on a sign-in sheet. [ECF No. 287 ¶ 16]. From this sign-in sheet, it is undisputed that the following defendants were present at the crime scene that evening: Garvin, Guillermo, Roach, Zuk, Hollow, and Cooney. [ECF No. 329 ¶ 7; ECF No. 307-15]. Garvin arrived at the Apartment at 8:27 p.m. [ECF No. 307-15 at 2]. He began giving instructions to the police officers who were at the scene and contacted the MSP to send a crime scene technician, chemist, and ballistician. [ECF No. 287 ¶ 18].

MSP staff processed the crime scene and collected physical evidence, including cocaine, the telephone cords used to bind Daniel and Isidoro, and blood-stained clothing. [ECF No. 287

¶ 20; ECF No. 329 ¶ 7].  Cooney and Zuk both assisted with the collection and documentation of evidence.  [ECF No. 329 ¶ 7].  None of this physical evidence was connected to Plaintiff.  [Id.]. According to Garvin, he found a baseball hat with an MSP logo at the crime scene, bagged it, marked it as evidence, and held it for six months before sending it to the lab for processing. [ECF No. 329 ¶ 11; ECF No. 306-23 at 352–58; ECF No. 307-11 at 4 (lab report stating the MSP hat was received from Garvin in June 1994)].  There are no photos of the hat from the crime scene.  [ECF No. 329 ¶ 11].

4.      Interviewing Isidoro

Lynn Police officers canvassed the nearby apartments, but they did not encounter anyone with information about the crime.  Therefore, to the knowledge of the police on the night of the murder, Isidoro was the sole witness to the crime.  [ECF No. 287 ¶ 19; ECF No. 329 ¶ 9].  At around 11:15 p.m., Garvin, Roach, and Guillermo interviewed Isidoro at the crime scene.  [ECF No. 287 ¶ 29; ECF No. 329 ¶ 9].  During this interview, Guillermo served as an interpreter because he was fluent in Spanish and Isidoro spoke only limited English.  [ECF No. 287 ¶ 30]. Isidoro described the two armed men who had broken into the Apartment as Puerto Rican and between 5'10" and 6' tall.  [ECF No. 329 ¶ 10].  One of the men was twenty years old, "chunkier," clean shaven, had dark curly hair that was shaved on the sides, and had a medium complexion.  [Id.].  He was wearing blue jeans, a plain brown sweatshirt, and a white turtleneck. [Id.].  The other man was twenty-one or twenty-two years old, thinner, clean shaven, and had a darker complexion.  [Id.].  Isidoro also told Garvin, Roach, and Guillermo that the second suspect was wearing a baseball hat with an MSP logo on it.  [Id. ¶ 11; ECF No. 294-17].  Isidoro also told them that an individual named Polanco had been present during the murder, but he did

not mention anyone else.[5]  [ECF No. 329 ¶ 9; ECF No. 294-17].  Garvin made a report of this interview.  [ECF No. 294-17].

After the initial interview at the crime scene, Isidoro was taken to the Lynn Police Department, where Garvin and Roach—with Guillermo still serving as an interpreter—showed him mug books that contained hundreds of photographs of people who had been arrested in Lynn.  [ECF No. 287 ¶¶ 31, 33; ECF No. 329 ¶ 15].  Garvin and Roach told Isidoro, through Guillermo, that he should look slowly through the mug books, that the culprit may or may not be in the mug books, and that if Isidoro saw the culprit, he should point out the photo.  [ECF No. 287 ¶ 33; ECF No. 329 ¶ 15].  While looking through the mug books, Isidoro stopped at a photo of a man named Mariano Bonifacio.  [ECF No. 287 ¶ 34; ECF No. 329 ¶ 15].  Defendants assert that Isidoro said that Bonifacio looked like one of the armed men, but that it was not him.  [ECF No. 287 ¶ 34].  Roach, Guillermo, and Garvin did not write a formal police report documenting this identification procedure.  [ECF No. 329 ¶ 16].  Roach did make a handwritten note documenting Isidoro's review of the mug books, which said "[w]e showed him 3–4 books of pictures.  He picked out Mariano Bonifacio as someone who looked like the person."  [ECF No. 294-55 ¶ 14, 6].  While at the station, Isidoro also changed his description of the suspects, but this change was not memorialized in a report.[6]  [ECF No. 306-15 at 300–01].

On January 14, 1994, a week after the murder, Isidoro was shown a photo array of eight to ten photographs.  [ECF No. 287 ¶ 39; ECF No. 329 ¶ 22].  The photo array included a newer, color photograph of Bonifacio.  [ECF No. 287 ¶ 39; ECF No. 329 ¶ 22].  Isidoro again stopped

---

[5] Polanco has never been found and never testified in the underlying criminal proceedings.  [ECF No. 329 ¶ 9].

[6] The exact change in the description is not entirely clear from the record.  Roach testified that Isidoro initially gave a general description, but once he was at the station and calmed down, "then the description changed."  [ECF No. 306-15 at 300].

on the photo of Bonifacio.  [ECF No. 287 ¶ 39; ECF No. 329 ¶ 23].  Garvin testified that, during

the array procedure, Isidoro said that the photograph looked like, but was not, one of the

intruders.  [ECF No. 306-23 at 414].  Garvin, Roach, and Guillermo did not write a report after

showing Isidoro the array or make a copy of the photo array.  [ECF No. 287 ¶ 39; ECF No. 329

¶ 23].  Garvin did, however, make notes on the back of the Bonifacio photo shown to Isidoro.

[ECF No. 329 ¶ 23].  The note reads, "Array shown to Isidoro Rodriguez on 1-14-94 @ 1145 hrs

@ 16 Alice Ave, 2nd Floor."  [ECF No. 308-12].  This handwritten note and the photo were not

produced to the defense with the prosecution's omnibus discovery response, [ECF No. 329 ¶ 24;

ECF No. 294-34 at 38], and Plaintiff contends it was never shared with defense counsel.

After the photo array was shown to Isidoro, Roach also added to the handwritten note he

first made on January 7, 1994.  He testified that he added the following sentence to the note:

"[w]e got a (recent) newer picture of Bonifacio and showed it in an arrangement of 10 pictures to

him.  He said it looked like the man in his apartment, but was not him."  [ECF No. 306-15 at

335–36; ECF No. 294-55 ¶ 14, 6].  This note was produced to defense counsel before the

criminal trial, but it does not contain any dates to indicate when each different sentence was

written.  [ECF No. 294-34 at 38].

### 5.    The Bonifacio Report

In November 1993, several weeks before Daniel's murder, Bonifacio had been arrested in

Lynn and was charged with a non-fatal shooting of a man named Victor Batista.  [ECF No. 287

¶ 35; ECF No. 329 ¶ 17; ECF No. 307-13].  Roach, Guillermo, and Zuk were involved in the

investigation into Batista's shooting.  [ECF No. 287 ¶ 35–36; ECF No. 329 ¶ 17; ECF No.

307-13].  On November 14, 1993, Roach wrote a report about his investigation into the

Bonifacio shooting (the "Bonifacio Report").  [ECF No. 307-13].  The shooting-related charges

against Bonifacio were dismissed on March 29, 1994, but the records explaining why the charges were dropped have been destroyed.  [ECF No. 287 ¶ 130].  The Bonifacio Report was not produced to Plaintiff's defense counsel before or during his criminal trial.  [ECF No. 329 ¶ 19].

On one version of the Bonifacio Report there are handwritten notes, and next to Bonifacio's name one of those notes reads "Cooperator."  [ECF No. 307-13 at 5].  Plaintiff contends these notes, which were also not disclosed before trial, are evidence that Bonifacio cooperated with police and explain why the charges against Bonifacio were subsequently dropped.  [ECF No. 329 ¶ 18].  Roach testified that these notes are not in his handwriting, that he does not know who wrote them or what they mean, and that Bonifacio was not a cooperator in any of his investigations.  [306-15 at 372–73].  Raymond Buso, an attorney who represented Bonifacio,[7] testified that he had no firsthand knowledge that Bonifacio was a cooperator, but that he had reviewed Bonifacio's criminal history and thought it unusual that Bonifacio had so many charges against him favorably resolved, which suggested to Buso that Bonifacio was a cooperator.  [ECF No. 306-22 at 8–11, 39–45].

### 6. Investigating Bonifacio

After Isidoro stopped on Bonifacio's photo in the mug book, Garvin asked Roach about Bonifacio's charges.  [ECF No. 287 ¶ 35].  Roach told Garvin that the November 1993 shooting was essentially a dispute between neighbors that occurred during an argument over loud music, that a different weapon was used than in Daniel's shooting,[8] and that it was non-fatal.  [ECF No.

---

[7] Buso also represented Juan, Plaintiff's co-defendant, during the original criminal trial.  [ECF No. 306-22 at 5].

[8] In 2015, during one of Plaintiff's post-conviction proceedings, the prosecution and Plaintiff stipulated that the weapon that fired the shot at Daniel could not have been the same one used in the November 1993 shooting.  [ECF No. 294-21 at 2].

306-23 at 37, 51].  Garvin also spoke with Zuk after speaking with Roach, and Zuk related a

similar account of the shooting and again highlighted its differences with Daniel's murder.  [Id.

at 47–48].  Plaintiff avers that the shootings were similar because they took place within a few

weeks of each other, the locations were close to each other, one of the assailants was described

as a Hispanic man with a light complexion, and each appeared to be a robbery of a drug dealer.

[ECF No. 329 ¶ 17].

Bonifacio was "a person of interest" in Daniel's homicide investigation after the mug

book procedure.  [ECF No. 308-37 at 91–92].  His criminal history report was run by someone at

the Lynn Police Department on January 8, 1994 and then again on January 14, 1994.  [ECF No.

305-3; ECF No. 305-4; ECF No. 306-23 at 99–100].  Garvin denies that he ran the reports,[9]

[ECF No. 306-23 at 99], and Roach testified that although he would have been the person most

likely to have printed criminal history reports in January 1994, he has no recollection of running

Bonifacio's report, [ECF No. 306-15 at 367–68].  These criminal history reports were not listed

on the omnibus discovery provided to Plaintiff's defense counsel before trial.  [ECF No. 329

¶ 21].  Plaintiff contends that this means the criminal histories were not disclosed, while

Defendants contend that not being listed on the omnibus discovery is not dispositive.  [Id.].

### 7.   Isidoro Identifies Plaintiff and the Arrest

On January 16, 1994, Isidoro got a haircut at a barber shop in Lynn.  [ECF No. 287 ¶ 40;

ECF No. 329 ¶ 29].  Plaintiff and his friend Juan Rodriguez were also at the barber shop.[10]  [ECF

---

[9] At a post-conviction proceeding in 2014, Garvin also testified that he would have discussed
Isidoro stopping on the photo with Guillermo and Roach and that as part of their discussions
"[he] would have . . . pull[ed] up . . . a Lynn Police Record regarding Mr. Bonifacio and
obtain[ed] any information [they] could about him, regarding his address just to follow up on it."
[ECF No. 308-37 at 87–88].

[10] Juan was also convicted of Daniel's homicide in 1994, but he is not a party to this lawsuit.

No. 287 ¶ 40; ECF No. 329 ¶ 29].  Isidoro went up to Plaintiff and asked for his name, was generally friendly towards him, and said he looked like a friend.  [ECF No. 308-38 at 12].  Plaintiff told Isidoro his name, and Isidoro left.  [Id. at 12–13].  At this time, Isidoro's girlfriend and Plaintiff were both living at the same address, 5 Herbert Street.  [ECF No. 305-30 at 99].

After he left the barber shop, Isidoro called his friend Cheo Cuevas and told him that he saw the men who murdered his brother at the barber shop.  [ECF No. 287 ¶ 41].  Isidoro and Cuevas returned to the shop, but Plaintiff had already left.  [ECF No. 308-31 at 99].  Isidoro and Cuevas then went to a restaurant nearby, the Rincon Criollo, where they saw Plaintiff and Juan in the window.  [Id.].  After that, they went to the Lynn Police Department, where Cuevas spoke with someone in English and reported that Isidoro had seen the two men who had murdered his brother.  [Id. at 100–01; ECF No. 287 ¶ 42].  Luise, Gokas, and Scannell then accompanied Isidoro to the Rincon Criollo.  [ECF No. 287 ¶ 43; ECF No. 329 ¶ 31].  Cuevas did not go with them.  [ECF No. 287 ¶ 45].  Luise, Scannell, and Gokas did not speak Spanish, although Luise knew enough Spanish words to complete a booking sheet.  [Id.].

When they arrived, Plaintiff and Juan were still at the restaurant, and Isidoro pointed them out to the police officers.  [ECF No. 308-31 at 103 (Isidoro's trial testimony stating that he showed Plaintiff and Juan to the police officers at the restaurant)].  Luise, Gokas, and Scannell questioned Plaintiff and Juan, telling them that Isidoro had identified them as being involved in the murder.  [ECF No. 287 ¶ 46; ECF No. 306-29 at 56 (Plaintiff's 2016 deposition stating that the police "asked us if we were involved in an incident, that Isidoro had said that we were involved in an incident, a shooting")].  Jorge Pimental, Plaintiff's friend, and another child, who happened to be near the restaurant, both helped to interpret the conversation because Plaintiff spoke limited English.  [ECF No. 306-27 at 102–03; ECF No. 306-29 at 57].  The officers took

down Plaintiff's and Juan's names and addresses, but they did not arrest them at the restaurant. [ECF No. 287 ¶¶ 46–47].  Gokas testified that due to the language difficulty, they did not have probable cause to arrest Plaintiff.[11]  [ECF No. 305-21 at 213].  Luise also testified that the officers "had nothing to arrest [Plaintiff] on."  [ECF No. 305-23 at 246].  Gokas prepared a report about the incident and gave the report to Roach to review.  [ECF No. 307-39].  The report is dated January 19, 1994, which is three days after they went to the Rincon Criollo.  [Id.].

The next day, on January 17, 1994, Garvin brought Isidoro and Cuevas to the Lynn Police Department, where Roach, Garvin, and Cooney interviewed Isidoro with Cuevas interpreting.  [ECF No. 287 ¶ 50; ECF No. 329 ¶ 35].  The report documenting that interview states that Isidoro confirmed that Plaintiff and Juan, whom he had seen at the barber shop and restaurant, were the two men involved in the murder.  [ECF No. 307-38 ¶ 3].  After the interview, an arrest warrant was sought.  [Id. ¶ 5].  Roach submitted an affidavit in support of the arrest warrant application, which issued after a Massachusetts clerk-magistrate found that probable cause existed.  [ECF No. 287 ¶ 50].  Plaintiff and Juan were arrested for Daniel's murder on January 17, 1994 and a search warrant was executed.  [ECF No. 307-26; ECF No. 307-30; ECF No. 307-34].  After Plaintiff's arrest, Roach prepared a supplemental report detailing the incident at Rincon Criollo, the subsequent interview with Isidoro and Cuevas, and the arrest.  [ECF No. 307-38].

### 8.    Post-Arrest Identifications

Assistant District Attorney Kevin Mitchell was assigned to the investigation within forty-eight hours of Plaintiff's arrest and remained in charge of the investigation through the trial.

---

[11] Gokas could not recall if there was any other factor beyond language difficulties that led him to conclude that there was no probable cause. [ECF No. 305-21 at 213–14].

[ECF No. 287 ¶ 21].  Garvin and Roach were subject to Mitchell's control and direction.  [Id. ¶ 25].

On February 18, 1994, Isidoro went to the Lynn Police Department and was shown two other photo arrays by Garvin and Roach.  [ECF No. 287 ¶ 58; ECF No. 329 ¶ 46].  Each array contained 8 color photographs.  [ECF No. 287 ¶ 58].  Isidoro was instructed to examine all the photographs and to indicate if any of the men in the photographs were involved in the murder. [Id. ¶ 59].  Isidoro was not told that the suspects were in the array.  [Id.].  Isidoro identified Plaintiff in the first array.  [Id.].  The second array was presented in the same manner, and Isidoro picked Juan out of the array and stated that he was the man who pointed a gun at him. [Id. ¶ 60].  Garvin made a report of the February 18, 1994 identification.  [ECF No. 294-29; ECF No. 307-42].  At some point after the arrest, at his home on Alice Avenue, Isidoro was also shown another photo array with Plaintiff's photo.[12]  [ECF No. 308-37 at 94].

Although he was not present for the February 18, 1994 photo arrays, Mitchell's practice would have been to not show a witness photos of a suspect before a live line-up.  [ECF No. 305-36 at 123–24].

Mitchell filed a motion with the Lynn District Court for an order to conduct a live line-up identification.  [ECF No. 287 ¶ 62; ECF No. 294-84].  The Court allowed the motion, and the live line-up took place on March 16, 1994.  [ECF No. 287 ¶¶ 62–63].  The line-up was transcribed by an independent court-certified stenographer, and the Sheriff's Department selected the line-up participants.  [Id. ¶ 64; ECF No. 294-30 (line-up transcript)].  Two line-ups consisting of ten men each were conducted.  [ECF No. 294-30 at 4].  Mitchell, attorneys for

---

[12] It is unclear from the record when this happened or the circumstances surrounding this identification, but Garvin testified that he recalled such an identification occurring after Plaintiff's arrest.  [ECF No. 308-37 at 94].

Plaintiff and Juan, Garvin, Cooney, and Roach were all present.[13]  [ECF No. 287 ¶ 64; ECF No. 294-30 at 2–3].  Mitchell instructed Isidoro on the procedure for the line-up, and Isidoro indicated that he understood and had no questions.  [ECF No. 294-30 at 5].  Isidoro identified Plaintiff and Juan during the line-ups.  [Id. at 8–9, 14].

9.    Probable Cause Hearing and Grand Jury

After the line-up, a probable cause hearing took place on August 22, 1994.  [ECF No. 287 ¶ 68; ECF No. 294-32 (probable cause transcript)].  Mitchell testified that the probable cause hearing allowed him to assess Isidoro's credibility as a trial witness and to preserve his testimony.  [ECF No. 287 ¶ 68].  Garvin, Roach, and Guillermo met with Isidoro prior to the probable cause hearing.  [ECF No. 307-8 at 3–4].  Defense counsel was present at the probable cause hearing and had the opportunity to cross-examine Isidoro.  [ECF No. 294-32 at 30].  During his direct examination, Isidoro identified Plaintiff as the man inside the Apartment.  [Id. at 7].  During cross-examination about the Bonifacio photos, Isidoro testified that he told Guillermo "I kept looking at [the photo of Bonifacio], I talked to [Guillermo], I explained to [Guillermo] [that I] can't tell . . . whether it is . . . or not."  [Id. at 65].  When asked, "Did you think that [Bonifacio] looked like the person that had been in your apartment?" Isidoro responded, "Yes, that's right."  [Id. at 64].  The judge found probable cause.  [Id. at 73].

On September 7, 1994, Mitchell presented evidence to the Grand Jury for Essex County.  [ECF No. 294-33].  Garvin was the only witness that testified at the grand jury hearing.  [ECF No. 294-33 at 2, 4; ECF No. 329 ¶ 57].  Garvin, Roach, and Guillermo met with Isidoro prior to the grand jury proceeding.  [ECF No. 307-8 at 3–4].  After hearing the evidence and testimony,

---

[13] Zuk was also at the jail at the time of the line-up, but he and Cooney were in a side room and not actually involved in the line-up.  [ECF No. 287 ¶ 221; ECF No. 329 ¶ 52].

the grand jury returned indictments for murder, home invasion, and armed robbery against Plaintiff and Juan.  [ECF No. 287 ¶ 73; ECF No. 294-75; ECF No. 294-33 at 20].

          10.    <u>The MSP Subpoena</u>

In this litigation, Plaintiff also subpoenaed the MSP's investigative file.  [ECF No. 308-22; ECF No. 329 ¶ 43 n.3].  That file contained a report written by Cooney detailing a narcotics arrest and the investigation of two individuals named Torres and Mejia ("the Cooney Report").  [ECF No. 308-22 at 94–98].  The Cooney Report notes that Cooney became aware of Torres after a search of 5 Herbert Street, the building where Isidoro's girlfriend was living.  [<u>Id.</u> at 94].  Further, the Cooney Report states that a confidential informant told Cooney that another person was involved in Daniel's murder.  [<u>Id.</u> at 95].  The file also contained handwritten notes that indicate that someone named "Pena" matched one of Isidoro's descriptions, [ECF No. 308-23 at 48], and that "Echivarria [sic] not involved . . . Ech at motel," [<u>id.</u> at 73].

          11.    <u>Gary Sevinor</u>

The parties present diametrically opposed accounts of the facts related to Gary Sevinor. Defendants assert that a man named Gary Sevinor and another unnamed individual were also at the Apartment on the night of the murder.  [ECF No. 287 ¶¶ 5, 9].  According to Defendants, Sevinor was at the Apartment to buy cocaine, gave $100.00 to someone in the Apartment, and that person left to get the cocaine while Sevinor waited.  [<u>Id.</u> ¶¶ 5, 8].  While Sevinor waited, the two armed men entered the Apartment and Sevinor was also tied up, dragged into a closet, and robbed of his money, watch, and keys.  [<u>Id.</u> ¶ 10].  As he was dragged into the closet, Sevinor's hat, which had an MSP insignia, was knocked from his head.  [<u>Id.</u>].  After the murder, Sevinor and the unidentified man were untied by someone, and both left before the police arrived.  [<u>Id.</u>

¶ 12].  At Plaintiff's trial, Sevinor testified that the intruders were directly in front of him at one point and that he looked directly at their faces.  [Id. ¶ 11].

Plaintiff contends that Sevinor was never at the Apartment and that he was fabricated as a witness.  [ECF No. 329 ¶ 58].  Reports from the night of the murder list only Polanco as a "missing witness" and do not mention Sevinor or anyone else.  [ECF No. 307-22; ECF No. 307-17].  At trial, Isidoro testified that he did not see Sevinor at the Apartment on the night of the murder.  [ECF No. 308-32 at 15].

The parties do agree, however, that Garvin and Roach met with Sevinor prior to Plaintiff's trial.  [ECF No. 329 ¶ 58].  Sevinor was a regular drug user and dealer who worked as an informant for the Marblehead Police Department.  [Id.].  Mitchell learned from a Chief Detective at the Marblehead Police Department that Sevinor had a habit of wearing an MSP hat. [ECF No. 287 ¶ 74].  Mitchell was aware of the MSP hat recovered at the crime scene, and he told Garvin to talk with Sevinor to find out if he was at the scene.  [Id. ¶¶ 74–75].

Garvin found Sevinor in jail awaiting trial on unrelated charges.  [ECF No. 329 ¶ 58]. On January 18, 1995, Garvin and Roach interviewed Sevinor for the first time at the jail.  [ECF No. 287 ¶ 76; ECF No. 329 ¶ 58].  The interview took about twenty minutes, and Sevinor admitted he was at the Apartment to buy cocaine when Daniel was murdered.  [ECF No. 287 ¶ 76].  Garvin wrote a report memorializing the interview.  [ECF No. 308-3].  During his deposition for this case, Sevinor testified that at an interview Garvin told him that there was (1) a video of Sevinor entering the Washington Street apartment building wearing the MSP hat, and (2) another video of Plaintiff and Juan entering the building.  [ECF No. 305-41 at 93–100]. Sevinor also testified that he saw some of this video footage during a third visit from Garvin, but he retracted that statement later in the deposition and testified that he had never seen a video of

the suspects.  [Id. at 100, 272–73].  No videos have ever been disclosed to Plaintiff, and

Defendants contend that these videos do not exist.  [ECF No. 329 ¶¶ 66, 75].  Sevinor also

testified that he arrived at the Apartment between 11 p.m. and midnight, then later clarified that

he did not really know when he had arrived.  [ECF No. 305-41 at 176–77].[14]

A month later, on February 20, 1995, Garvin and Roach interviewed Sevinor again.

[ECF No. 287 ¶ 77; ECF No. 329 ¶ 64].  Garvin, at Mitchell's direction, showed Sevinor two

photo arrays.  [ECF No. 287 ¶ 77; ECF No. 329 ¶ 64].  Sevinor identified a photo of Plaintiff as

someone who he was pretty sure was one of the men at the Apartment, but he could not swear to

it.  [ECF No. 287 ¶ 77].  Sevinor circled the photo he picked out and wrote, "I COULDN'T

SWEAR TO [sic] THIS WAS THE MAN THAT SAID ON THE FLOOR FACE DOWN."

[ECF No. 329 ¶ 64; ECF No. 308-18; ECF No. 287 ¶ 77].  Although Mitchell agreed not to

prosecute Sevinor in connection with anything that occurred on the night of the murder, [ECF

No. 308-26 at 25–30], Sevinor testified that he received no deal for testifying as a witness and

that he was not promised anything in return, [ECF No. 305-41 at 291–93].  He ultimately served

his entire jail sentence for the unrelated crime.  [ECF No. 287 ¶ 211].

12.   Discovery, Trial, and Post-Trial Proceedings

The prosecution produced an omnibus discovery response prior to Plaintiff's criminal

trial.  [ECF No. 294-34].  The discovery response, inter alia, identified the January 7, 1994 mug

book procedure and the January 14, 1994 photo array, and described Isidoro's description of

Bonifacio as "similar to, but not one of the assailants."  [Id. at 1].  Roach's handwritten notes

about the mug book procedure were attached.  [Id. at 38].  Sevinor's identifications were also

included in the discovery response.  [Id. at 52].  At the time of the investigation, any documents

---

[14] The murder happened around 7:30 p.m.  [ECF No. 307-19 at 2].

or information that the police officers had would be given to Mitchell rather than directly to defense counsel, and Mitchell would decide what information would be disclosed and/or whether something was exculpatory.  [ECF No. 287 ¶¶ 82–87].

Plaintiff and Juan were tried from January 11 to January 26, 1996.  [ECF No. 287 ¶ 88].  Initially, Isidoro failed to appear for the criminal trial, but a bench warrant was issued for him, and he was brought to court by Garvin and Roach.  [ECF No. 329 ¶ 79].  Isidoro did eventually testify at the trial and identified Plaintiff as one of the men involved in the murder.  [ECF No. 308-31 at 69–70].  During his examination, Isidoro was asked if anyone had made a sketch from his description of the suspects on the night of the murder, and he testified that "I think I remember they did that drawing as I was telling them."  [ECF No. 308-32 at 12].  When asked if he told the police that Bonifacio was one of the armed men in the Apartment, Isidoro testified that "[n]o, I never said that.  I said that it looked like that person."  [ECF No. 308-31 at 88 (Isidoro's testimony at trial)].  Sevinor also testified about what he saw the night of the murder and about the photo array shown to him during the interview with Garvin and Roach.  [ECF No. 287 ¶ 77; ECF No. 294-1 at 46–47].

At trial, Bonifacio was discussed in connection with the mug book identification procedure and the photo array.  [ECF No. 308-28 at 121].  Garvin and Guillermo both testified about the identification procedures used with Isidoro in January 1994.  [ECF No. 308-33 at 128–34; ECF No. 308-34 at 31–32].  They both explained that Isidoro said Bonifacio looked like one of the armed men, but was not him.  [ECF No. 308-33 at 130–31; ECF No. 308-34 at 31–32].  Luise also testified at trial.  [ECF No. 308-33 at 4].  A short statement from Zuk about a bag of cocaine found at the scene was read into evidence.  [ECF No. 287 ¶ 222].  Plaintiff did not testify at trial.  [Id. ¶ 97].

A jury found Plaintiff and Juan guilty. [ECF No. 308-35 at 11–14]. The trial judge immediately overturned Juan's conviction for lack of evidence, but denied Plaintiff's motion to overturn the conviction based in part on Isidoro's testimony indicating that he had observed Plaintiff for longer than he had observed Juan and the corroboration of Sevinor's identification. [Id. at 17–21]. Plaintiff was sentenced to life in prison. [Id. at 26].

On November 1, 2011, Plaintiff filed a motion seeking exculpatory evidence about Bonifacio, which attached newspaper articles about the November 1993 shooting, the criminal complaint against Bonifacio, and the docket for his criminal case. [ECF No. 287 ¶¶ 359–60; ECF No. 294-69 at 4–5; ECF No. 294-70]. He also filed an amended motion for a new trial on December 3, 2011, requesting a new trial based on the withheld exculpatory evidence concerning Bonifacio. [ECF No. 287 ¶ 361; ECF No. 294-69 at 5; ECF No. 294-71]. On February 27, 2014, Plaintiff's defense counsel wrote the District Attorney about the withheld Bonifacio-related evidence. [ECF No. 287 ¶ 363].

On April 30, 2015, a judge found that Plaintiff received ineffective assistance of counsel and his motion for a new trial was granted because, among other things, his attorney stated in front of the jury that he would call Plaintiff as a witness, but he did not, and his attorney failed to impeach Isidoro with evidence from the probable cause hearing. [ECF No. 308-39]. After Plaintiff's conviction was vacated, the District Attorney declined to re-try the case and entered a *nolle prosequi.* [ECF No. 287 ¶¶ 106–07; ECF No. 294-69 at 7].

### 13.     The City's Policies and Practices

At the relevant time, the City had an approximately 500-page manual for policies and procedures that was prepared by the Municipal Police Institute and was the standard manual used throughout Massachusetts. [ECF No. 294-52 ¶ 50]. It was created in 1977, and there was no

requirement that an officer read the entire manual or a process to track which officers had reviewed it.  [ECF No. 329 ¶ 86].  As the Police Chief, Hollow had final policy-making authority for general police department policies.  [Id. ¶ 87].  The City's Rule 30(b)(6) witness testified that he believed that the District Attorney's office would train Lynn police officers on disclosure obligations, [ECF No. 294-57 at 31; ECF No. 287 ¶ 336], but Mitchell testified that he did not train Lynn police officers about handling exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), and he does not recall anyone else in the District Attorney's office providing that training.  [ECF No. 287 ¶ 289].  From 1992 through 1996, the City did not have a specific policy on Brady obligations or any other written policies on disclosing evidence regarding alternative suspects.  [ECF No. 329 ¶ 89].  When questioned, Luise could not recall whether he had received training related to disclosure obligations.  [ECF No. 294-60 at 10].

The City had no authority over the MSP or the District Attorney.  [ECF No. 287 ¶ 281]. The District Attorney had access to the Lynn Police Department's homicide files.  [Id. ¶ 250].  A copy of the Lynn Police Department's homicide files would be stored in Rowe's office, because he was a Captain, and he would have authority to give that file to the MSP.  [ECF No. 305-27 at 93].

### 14.   Plaintiff's Presentment

On June 14, 2016, Plaintiff's counsel sent his presentment letter to the City via certified U.S. Mail.  [ECF No. 287 ¶¶ 346–47].  The letter was addressed to "Lynn City Hall & Memorial Auditorium, Rm. 306" and it appears to have been received by Stephen Martin, who has never been the Mayor of Lynn, the City Solicitor, or the City Clerk.  [ECF No. 287 ¶¶ 349–55; ECF No. 294-68; ECF No. 294-73 at 4].  Martin worked in the mailroom, and his name was kept on a

stamp in the mail room, but he would not have physically received, opened, or delivered the letter.  [ECF No. 287 ¶¶ 353–54; ECF No. 294-68].

### C.  Procedural Background

Plaintiff filed his complaint on June 15, 2016.  [ECF No. 1 ("Compl.")].  In 2016, Defendants filed motions to dismiss, which the Court denied in part and granted in part, allowing the majority of Plaintiff's claims to proceed to discovery.  [ECF No. 96].  Plaintiff's remaining claims are: a violation of his right to due process under 42 U.S.C. § 1983 (Count I),[15] [Compl. ¶¶ 65–83]; malicious prosecution under 42 U.S.C. § 1983 against the City only (Count II),[16] [id. ¶¶ 84–93];[17] conspiracy to deprive him of his constitutional rights under 42 U.S.C. § 1983 (Count III), [id. ¶¶ 94–100]; failure to intervene under 42 U.S.C. § 1983 against the City only (Count IV),[18] [id. ¶¶ 101–06];[19] malicious prosecution under Massachusetts common law against

---

[15] The Court dismissed any claim that Sevinor's pretrial identification was unduly suggestive because it was precluded.  [ECF No. 96 at 19].  Plaintiff has moved for reconsideration of that ruling, [ECF No. 296], which will be addressed in a separate Order.

[16] The City moved for summary judgment on Count II arguing that it is not liable because its individual employees are entitled to qualified immunity on this claim.  [ECF No. 285 at 48–49 (citing Machado v. Weare Police Dep't, 494 F. App'x 102, 107 (1st Cir. 2012)].  Plaintiff cited to case law stating that "[i]t is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity."  Joyce v. Town of Tewksbury, Mass., 112 F.3d 19, 23 (1st Cir. 1997); [ECF No. 312 at 59 n.48].  Because no party developed this claim beyond cursory citations regarding qualified immunity, the Court is unable to undertake a reasoned analysis and summary judgment is DENIED.

[17] This claim was dismissed as to the individual defendants.  [ECF No. 96 at 16–17].

[18] Plaintiff abandoned any failure to intervene claim against the City, [ECF No. 312 at 63 n.48], and the City's motion for summary judgment on Count IV is GRANTED.

[19] This claim was dismissed as to the individual defendants.  [ECF No. 96 at 21–23].

the individual defendants only (Count V), [id. ¶¶ 107–12];[20] negligence under Massachusetts

common law (Count VI), [id. ¶¶ 113–17]; intentional infliction of emotional distress under

Massachusetts common law against the individual defendants only (Count VII), [id. ¶¶ 118–

20];[21] negligent infliction of emotional distress under Massachusetts common law (Count VIII),

[id. ¶¶ 121–25]; a violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I

("MCRA") (Count IX), [id. ¶¶ 126–28];[22] and civil conspiracy under Massachusetts common

law against the individual defendants only (Count X), [id. ¶¶ 129–33].[23]

Defendants moved for summary judgment on October 28, 2020, [ECF Nos. 276, 277,

279, 280, 290, 292], which Plaintiff opposed on February 9, 2021, [ECF No. 304].  Defendants

filed their replies on May 7, 2021.  [ECF Nos. 327, 328, 330, 331, 333, 334].

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor

of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg

v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect

---

[20] At the motion to dismiss stage, Plaintiff conceded that his claims premised on intentional torts lie only against the individual defendants and not against the City.  [ECF No. 96 at 31 n.14].

[21] At the motion to dismiss stage, Plaintiff conceded that his claims premised on intentional torts lie only against the individual defendants and not against the City.  [ECF No. 96 at 31 n.14].

[22] This claim was dismissed as to the City.  [ECF No. 96 at 30].

[23] At the motion to dismiss stage, Plaintiff conceded that his claims premised on intentional torts lie only against the individual defendants and not against the City.  [ECF No. 96 at 31 n.14]; see also Wentworth Precious Metals, LLC v. City of Everett, No. 11-cv-10909, 2013 WL 441094, at *14 (D. Mass. Feb. 4, 2013) (noting that civil conspiracy is an intentional tort).

the outcome of the case under the controlling law." Cochran, 328 F.3d at 6 (citation omitted).

Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier

could decide the fact either way." Id. (citation omitted).  By invoking summary judgment, "the

moving party in effect declares that the evidence is insufficient to support the nonmoving party's

case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200,

204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact," the moving

party must "'affirmatively produce evidence that negates an essential element of the non-moving

party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the

non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández

v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124,

132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary

judgment, the nonmoving party must establish a trial-worthy issue by presenting enough

competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v.

Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (citation omitted).  That is, the nonmoving

party must set forth specific, material evidence showing that there is "a genuine disagreement as

to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to

the party opposing summary judgment, indulging all reasonable inferences in that party's favor."

Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the

nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48

(1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and

material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz, 896 F.2d at 8).

## III.   DISCUSSION

### A.   42 U.S.C. § 1983 Due Process (Count I) – Personal Liability

Plaintiff argues that the individual defendants violated the Due Process Clause of the Fourteenth Amendment by depriving him of his right to a fair trial because they (1) suppressed evidence; (2) fabricated evidence; and (3) engaged in unduly suggestive identification procedures.  [ECF No. 312 at 32–60].

In a § 1983 case, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); see also Brown v. Montoya, 662 F.3d 1152, 1163 (10th Cir. 2011) ("Personal liability 'under § 1983 must be based on personal involvement in the alleged constitutional violation.'" (citation omitted)).  To be liable, a "defendant must have personally participated in, encouraged, condoned, or acquiesced in rights-violating conduct."  Remus-Milan v. Irizarry-Pagan, 81 F. Supp. 3d 174, 178 (D.P.R. 2015).  The "mere presence [of an officer] at the scene, without more, does not by some mysterious alchemy render him responsible under Section 1983 for the actions of a fellow officer."  Calvi, 470 F.3d at 428.

#### 1.   Hollow and Rowe

The record is devoid of any facts demonstrating that Hollow or Rowe directly participated in any rights-violating conduct.  It is undisputed that neither Hollow nor Rowe attended any of the identification procedures with Isidoro, were involved in discussions about Bonifacio or any subsequent efforts to investigate him, were present at the Rincon Criollo, or took part in any interview with Sevinor.  At most, Hollow was present at the crime scene, Rowe

assigned Roach to assist the MSP with the investigation, and, as supervisors in the Lynn Police Department, they both would have been generally informed about investigation's progress and perhaps reviewed reports from the officers handling the case's day-to-day operations. Files were also stored in Rowe's office, and he had access to them. But Hollow and Rowe cannot be held liable merely because they were informed about the investigation and were present at the crime scene. Their liability must be based on their own personal misconduct. Iqbal, 556 U.S. at 677. Accordingly, because there is no evidence showing their direct involvement in any of the conduct that Plaintiff asserts violated his due process rights, Hollow and Rowe can be held liable only under a theory of supervisory liability, which is discussed infra in Section III.B.

        2.    Suppression of Exculpatory Evidence

Plaintiff argues he was denied a fair trial because the individual defendants suppressed: (1) exculpatory evidence related to Bonifacio; and (2) a long list of other exculpatory or impeaching evidence, including police sketches, video tapes, and tips from a confidential informant. [ECF No. 312 at 35–39]. Under Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Favorable evidence includes that which is exculpatory and/or useful for impeachment. Lopez v. Massachusetts, 480 F.3d 591, 594 (1st Cir. 2007). Evidence is "material" when there is a reasonable probability that, had the prosecution disclosed the evidence, the trial proceedings would have resulted differently. United States v. Bagley, 473 U.S. 667, 682 (1985). Police officers have an obligation to disclose favorable and material evidence to the prosecutor. Drumgold v. Callahan, 707 F.3d 28, 38 (1st Cir. 2011). Further, apart from any obligations arising from Brady, "deliberate concealment of material evidence by

the police, designed to grease the skids for false testimony and encourage wrongful conviction,

unarguably implicates a defendant's due process rights." Haley v. City of Boston, 657 F.3d 39,

49 (1st Cir. 2011). The First Circuit has applied the same materiality and favorability standards

regardless of whether the allegation is that law enforcement deliberately suppressed evidence or

merely failed to comply with their Brady obligations with a less culpable state of mind.

Drumgold, 707 F.3d at 39, 44–45.

a.   Exculpatory Evidence Related to Bonifacio

Plaintiff argues that:

- Rowe, Roach, Guillermo, Zuk, and Garvin suppressed evidence that: (1) Isidoro identified Bonifacio "without equivocation" from a mug book on the night of the murder, and (2) they investigated Bonifacio in connection with Daniel's killing, discussed his involvement with "the entire investigative team," and investigated his criminal history, [ECF No. 312 at 35];
- "Defendants" suppressed that Isidoro identified Bonifacio in a photo array a week after his first identification, [id.];
- "Defendants" suppressed the Bonifacio Report and the criminal histories that were run in January 1994, [id. at 35–36]; and
- "Defendants" suppressed that Bonifacio was a known drug dealer, a cooperator, and that his murder charges were dropped after Plaintiff's arrest, [id. at 36].

i.   Scannell, Luise, Gokas, Cooney, and Zuk

It is undisputed that Guillermo, Roach, and Garvin were the only defendants present at

the identifications where Isidoro mentioned Bonifacio. Plaintiff points to no evidence that

creates a genuine issue of material fact as to whether Scannell, Luise, Gokas, or Cooney had any

role in Isidoro's identifications relating to Bonifacio or the subsequent investigation into

Bonifacio, much less that they had a role in suppressing any evidence relating to that conduct.

Merely being an officer on the scene or involved in the investigation is not sufficient to establish

that the officer violated a constitutional right. Calvi, 470 F.3d at 428. At this stage of the

litigation, mere conclusory allegations that "all defendants" had a role in suppressing evidence

30

are insufficient.  In light of this absence of evidence, no reasonable jury could conclude that

Scannell, Luise, Gokas, or Cooney violated Plaintiff's due process rights by suppressing

evidence relating to Bonifacio.

As to Zuk, the record demonstrates that he investigated the Bonifacio shooting weeks

before Daniel's murder and discussed his investigation with Garvin.  At most, Plaintiff asserts in

his statement of facts that "Zuk knew about Bonifacio's criminal history and his cooperator

status, and covered up Isidoro's identifications of Bonifacio as the shooter."  [ECF No. 312

¶ 25].  This statement, however, is unsupported by Plaintiff's citations to the record.[24]  It is

undisputed that Zuk was not present during any identification procedures where Bonifacio was

mentioned, Zuk did not testify about Bonifacio at trial, and Plaintiff points to no other evidence

in the record to demonstrate that Zuk had any personal involvement suppressing any evidence

relating to Bonifacio.

### ii.   Garvin, Roach, and Guillermo

The parties fiercely contest the characterization of Isidoro's discussion of Bonifacio

during the January 1994 identification procedures and Garvin, Roach and Guillermo's actions

following those procedures.  A few facts, however, are undisputed: (1) in January 1994, Isidoro

was asked on two occasions to look at photos to identify the murderers, and on both occasions he

stopped on a photo of Bonifacio; (2) Roach and Garvin made handwritten notes about Isidoro's

actions; (3) no defendant made a more formal report regarding Bonifacio during the

investigation; (4) the prosecution's omnibus discovery response states that Bonifacio was never

identified as the assailant and characterizes him as a non-suspect; (5) Isidoro testified at trial that

---

[24] Plaintiff cites to Rowe's deposition, the Bonifacio Report, and excerpts and exhibits from
Buso's deposition.  [ECF No. 312 ¶ 25].  The cited evidence does not even mention Zuk or in
any way support an inference that he personally suppressed material relating to Bonifacio.

he did not identify Bonifacio as the assailant, but his testimony at the probable cause hearing was comparatively less firm; (6) Bonifacio's criminal history was run on two occasions after the murder and Garvin discussed the Bonifacio shooting with Roach and Zuk; and (7) the Bonifacio Report, the criminal history records, and Garvin's handwritten note about Bonifacio were not turned over to defense counsel.

As explained above, the key question in evaluating a suppression claim is whether the government suppressed evidence that was material and favorable to Plaintiff.  Brady, 373 U.S. at 87.  Taken as a whole, a reasonable jury could find that the evidence relating to Bonifacio was material and favorable because it indicates that another suspect was investigated, or, at the very least, it could have been used to impeach the prosecution's witnesses, which was significant in a case that hinged on eyewitness testimony.  Any evidence that may have discredited Isidoro's identification of Plaintiff would have had a reasonable probability of changing the outcome of trial.  While the defendants that were present during Isidoro's identifications argue that Isidoro unequivocally did not identify Bonifacio, a jury could infer from Roach and Garvin's subsequent steps that Bonifacio was at least a person of interest and that he was investigated.  Thus, evidence relating to his criminal history and the Bonifacio Report would be material.  Further, Roach's first handwritten note says, "[w]e showed him 3-4 books of pictures.  He picked out Mariano Bonifacio as someone who looked like the person," [ECF No. 312 ¶ 26], and a reasonable jury could interpret "looked like the person" as proof that Bonifacio was identified as the culprit, which triggered him being treated as a suspect.

Garvin, Roach, and Guillermo also argue that the Bonifacio evidence is not material because the Bonifacio Report contains hearsay accounts of how the shooting occurred, and therefore was inadmissible and would not have led to any admissible evidence.  [ECF No. 281 at

23–24; ECF No. 282 at 19–20].  Although Garvin, Roach, and Guillermo are correct that

"[w]ithheld information is material under Brady only if it would have been admissible at trial or

would have led to admissible evidence," DeCologero v. United States, 802 F.3d 155, 162 (1st

Cir. 2015), the Court is not persuaded by their argument.  First, they focus exclusively on the

Bonifacio Report, rather than the broader theory that investigation into Bonifacio as a suspect

generally was suppressed.  Second, even if some or all of the Bonifacio Report itself would be

inadmissible hearsay at Plaintiff's criminal trial, a reasonable jury could certainly find that

disclosure of that report, coupled with other evidence that some defendants began looking into

Bonifacio, would lead to admissible evidence.

Finally, Garvin, Roach, and Guillermo maintain that a competent defense counsel would

have discovered the Bonifacio Report with reasonable diligence.  [ECF No. 281 at 29–31; ECF

No. 282 at 22–23].  Courts, including this one, reject "the notion that defendants must scavenge

for hints of undisclosed Brady material when the prosecution represents that all such material has

been disclosed." Banks v. Dretke, 540 U.S. 668, 695 (2004).  Here, the message to Plaintiff's

defense counsel was that Bonifacio was never a suspect or investigated as one.

Taking the evidence in the light most favorable to Plaintiff, a reasonable jury could find

that Roach, Garvin, and Guillermo suppressed material evidence relating to Bonifacio.

b.     Other Exculpatory Evidence

Plaintiff next presents a lengthy list of other exculpatory evidence he argues was

withheld.  [ECF No. 312 at 36–38].

With relatively few exceptions, Plaintiff makes no effort to parse which defendant is

responsible for actually suppressing this evidence and instead broadly states that "Defendants

also suppressed the following exculpatory and impeachment evidence . . . ."  [ECF No. 312 at

36].  At the motion to dismiss stage, the Court recognized that Plaintiff faced the daunting task of sifting through evidence from decades ago in order to determine what rights-violating conduct was carried out and by whom.  [ECF No. 96 at 7–8].  Now that discovery is complete and this case has reached the summary judgment stage, Plaintiff's claims against each defendant cannot survive if there is no evidence in the record demonstrating that there is a genuine issue of fact as to their own conduct.  See Schand v. City of Springfield, 380 F. Supp. 3d 106, 142 (D. Mass. 2019) ("This case is now at the put-up-or-shut-up summary judgment stage, where Plaintiffs must point to cognizable evidence supporting a verdict against a particular defendant.").

Putting aside Plaintiff's failure to attribute the act of suppressing evidence to any individual defendant, the vast majority of the allegedly suppressed evidence relates to Bonifacio, Isidoro's description of the suspects, and Sevinor, which all are connected to the activities undertaken by Roach, Guillermo, and Garvin (i.e., interviewing Isidoro and Sevinor).  As described above, Plaintiff may proceed with his suppression theory against Garvin, Roach, and Guillermo and accordingly he may also raise any arguments related to other suppressed evidence.

This evidence, however, does not create a genuine issue of material fact as to the other individual defendants because Plaintiff does not point to any facts showing how Cooney, Zuk, Luise, Scannell, or Gokas had any role in suppressing it.  Broadly speaking, the allegedly suppressed evidence concerns: (1) Bonifacio; (2) lab results relating to evidence processed and bagged from the crime scene; (3) documents and videos relating to Sevinor; and (4) the MSP investigatory file.  It is undisputed that Luise, Scannell, and Gokas were not at the crime scene, had no role in anything relating to Bonifacio, and never met with Sevinor.  Even taking every inference in favor of Plaintiff, who failed to specify which defendant was responsible for what

action, there is no genuine issue of material fact as to whether Luise, Scannell, and Gokas had any role in suppressing this evidence.

Plaintiff argues that an investigatory file was subpoenaed from the MSP in this litigation and that materials in that file, including the Cooney Report and Cooney's handwritten notes, were not received during the criminal trial. Plaintiff asserts that Zuk and Cooney would have been aware of what was in the investigatory file, but his sole citation for that statement—Garvin's deposition—does not support it. [ECF No. 312 ¶ 43 (citing to Garvin's deposition testimony discussing that he would hold briefings with people, whom he could not recall other than Roach, and in no way indicating that Cooney or Zuk had knowledge of the investigatory file or that they suppressed that evidence)]. Further, the Cooney Report, which Plaintiff asserts was disclosed for the first time when he received the MSP subpoena response, was discussed on the record during a bench conference at the criminal trial, which undercuts Plaintiff's argument that that particular piece of evidence was even withheld. [ECF No. 308-32 at 105].

       3.    Fabricated Evidence

> [I]f any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit. Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction).

Limone v. Condon, 372 F.3d 39, 44–45 (1st Cir. 2004) (citation omitted).

In his statement of facts and opposition to summary judgment, Plaintiff asserts that the following evidence was fabricated:

- the MSP hat at the crime scene, [ECF No. 312 at 9];
- the reports and testimony that indicated that Isidoro did not identify Bonifacio and that Bonifacio was never a suspect, [id. at 50];
- Isidoro's identification of Plaintiff and Juan at the Rincon Criollo and the reports documenting that encounter, [id. at 50];

- Isidoro's identification of Plaintiff after his arrest, [id. at 51]; and
- Sevinor as an eyewitness at the crime scene, [id. at 51].

While Plaintiff maintains that all of the Lynn Police Officers, Cooney, Zuk, Garvin, and Hollow fabricated evidence, Plaintiff's brief focuses only on Garvin and Hollow because, according to Plaintiff, the other defendants do not adequately respond to his allegations of fabrication in their briefs and have waived their arguments.  Plaintiff faults these defendants for "assert[ing] in a single, conclusory sentence that there was no evidence they fabricated, without any further elaboration or citation to the record or case law."  [ECF No. 312 at 49].  The Court disagrees with Plaintiff's characterization of the briefing.  Zuk and the Lynn Police Officers asserted in their briefs that they did not fabricate evidence and that "Plaintiff has never identified which documents were fabricated or falsified" or put forth any proof connecting these defendants with the fabrication.  [ECF No. 281 at 5 n.5; ECF No. 293 at 11].  Cooney has similarly moved for summary judgment on the due process claim, arguing that there was no evidence connecting him to fabricated evidence related to Sevinor.  [ECF No. 291 at 10].  Defendants' statement of facts also describes the evidence in the record related to the "falsification of documents and coercion."  [ECF No. 287 ¶¶ 174–215].  While the argument was certainly brief, Zuk, Cooney, and the Lynn Police Officers did not waive it.  They have sufficiently argued that there is nothing in the record to show that they fabricated evidence and therefore there is no genuine issue of material fact.

Further, once Plaintiff asserted what specific evidence he believes was fabricated in his opposition brief, it was proper for defendants to respond to those arguments and clarify their own arguments in their reply briefs.  While "[t]he purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum," Noonan v. Wonderland Greyhound Park Realty LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010), a party may "use a

reply brief to clarify arguments previously made or to respond to an argument an opposing party raises in an opposition."  Allied Home Mortg. Cap. Corp. v. Mark, No. 12-cv-10158, 2014 WL 4964728, at *12 (D. Mass. Sept. 30, 2014).

a.      Zuk and Cooney

"It is a settled principle of Rule 56 jurisprudence that, where a nonmovant bears the burden of proof, [he] can defeat summary judgment only if [he] can 'reliably demonstrate that *specific facts* sufficient to create an authentic dispute exist.'"  Morales v. Ramirez, 906 F.2d 784, 789 n.6 (1st Cir. 1990) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  Construing the evidence in Plaintiff's favor, nothing in the record supports the inference that Cooney or Zuk had any role in fabricating evidence relating to Sevinor, the MSP hat, the Rincon Criollo encounter, or Bonifacio.  Plaintiff cannot survive summary judgment relying only on conclusory allegations and speculation that Zuk and Cooney fabricated evidence.

b.      Luise, Scannell, and Gokas

Luise, Scannell, and Gokas were not at present the crime scene, did not process evidence from the scene, had no role in interviewing Sevinor, were not present during Isidoro's selection of the Bonifacio photos or the subsequent investigation into Bonifacio, and were not involved with the photo arrays shown to Isidoro after Plaintiff's arrest.  Therefore, no reasonable jury could find that they had a role in fabricating evidence relating to those events.

They were, however, present at the Rincon Criollo and were involved in drafting a report relating to the incident.  As the Court understands it, Plaintiff's argument is that: (1) on January 16, 1994 Isidoro did not actually identify Plaintiff at the Rincon Criollo, and for this reason Plaintiff was not arrested; (2) following the incident at the restaurant, Roach, Garvin, Luise, Gokas, and Scannell met in order to fabricate a story about Isidoro identifying Plaintiff at the

restaurant; (3) this fabricated story was set forth in a report by Roach, which was written after Plaintiff was arrested; and (4) Gokas, Luise, and Scannell then schemed, and Gokas wrote another report on January 19, 1994 that parroted the fabricated allegations in Roach's report. [ECF No. 312 ¶¶ 34, 40]. Plaintiff argues that the following circumstances support the inference that the events at the restaurant were fabricated: (1) Defendants were already looking for individuals that lived at 5 Herbert Street, which is where Plaintiff lived, in connection with the murder; (2) Isidoro recognized Plaintiff because Plaintiff and Isidoro's girlfriend both lived at 5 Herbert Street; (3) an interpreter was present at the restaurant that could have translated; and (4) Gokas's report was submitted three days after the incident and after Plaintiff's arrest.

Plaintiff's fabrication theory requires the Court to infer that Isidoro did not go to the Lynn Police Department on his own and that he did not indicate to the officers, in some way, that Plaintiff and Juan were connected to the murder at the Apartment. The undisputed facts preclude the Court from drawing this conclusion. Even discounting the reports drafted in January 1994, Isidoro's uncontroverted testimony at trial states that he pointed Plaintiff and Juan out at the restaurant.[25] [ECF No. 308-31 at 103]. And, in Plaintiff's 2016 deposition, he testified that Isidoro saw him at the barber shop, and then, while he was at the restaurant, he saw Isidoro with police, observed Isidoro pointing, and then the police told him that Isidoro said he was involved in the shooting. [ECF No. 306-29 at 49–50, 55–56].

Regarding the interpreter, Plaintiff testified in his deposition that both a child and a man named Jorge Pimental translated the interaction. [ECF No. 306-29 at 57]. Gokas's report dated January 19, 1994, states that someone was interpreting at the restaurant, but that the person was not helpful. [ECF No. 307-39 at 3]. Roach's report did not mention an interpreter at all, [ECF

---

[25] Plaintiff does not argue that Luise, Scannell, or Gokas coerced, threatened, or intimidated Isidoro into lying about identifying Plaintiff at the restaurant.

No. 307-38], yet his affidavit in support of the search warrant for Plaintiff's apartment, dated

January 17, 1994, mentions that although a passerby was asked to interpret, there were still

language difficulties.  [ECF No. 307-37 at 4].  At trial, Luise testified that the interpreter they

used was only ten years old.  [ECF No. 308-33 at 85].  The evidence regarding the interpreter at

the Rincon Criollo is certainly inconsistent, but an inconsistency on this point does not support

the inference that Luise, Scannell, and Gokas made up Isidoro coming to the police station and

then lied that Isidoro pointed Plaintiff out to them.

 Accordingly, no reasonable jury could find that Luise, Scannell, or Gokas fabricated the

Rincon Criollo incident.

c.  Garvin, Roach, and Guillermo

 Taking the facts in the light most favorable to Plaintiff, a reasonable jury could find that

Garvin, Roach, and Guillermo were involved in fabricating evidence.

 First, the Bonifacio fabrication arguments are essentially a repackaging of the

suppression theories—Guillermo, Garvin, and Roach fabricated the "non-selection" story, which

led to the suppression of the actual selection and subsequent investigation of Bonifacio—and the

Court has already found that this theory survives summary judgment.

 Second, Plaintiff contends that, taking the facts in the light most favorable to him, the

evidence shows that Defendants fabricated the presence of Gary Sevinor at the Apartment on the

night of the murder.  [ECF No. 312 at 51].  It is undisputed that: (1) Sevinor was not identified as

an eyewitness on the night of the murder; (2) Isidoro testified that he did not see Sevinor the

night of the murder; and (3) the evidence that links Sevinor to the scene, the MSP hat, was

originally reported as connected to a suspect and it was not turned over to a laboratory until June

1994.  Accordingly, a reasonable jury may infer from these facts that Sevinor was not present at

39

the crime scene.  The Court acknowledges that a jury may just as easily infer that the officers did not pursue leads relating to the MSP hat and Sevinor until later in the investigation for another, non-culpable, reason.  At this stage, however, it is not the Court's role to determine which one of these inferences should be drawn.

### 4.    Unduly Suggestive Identification Procedures

Plaintiff proceeds on this theory against Roach, Garvin, Guillermo, Scannell, Luise, and Gokas.[26]  [ECF No. 312 at 54].  He argues that these defendants conducted unduly suggestive identification procedures with Isidoro, which violated his right to due process when the identifications were then used in his criminal proceedings.  [Id.].  Specifically, Plaintiff challenges Isidoro's identification of Plaintiff at the restaurant, and in the subsequent photo array, live line-up, and probable cause hearing.  [Id. at 55–61].  Although Plaintiff proceeds on this theory against Guillermo, Guillermo was not present at any of the identifications that Plaintiff challenges.  Accordingly, given the absence of any facts in the record linking Guillermo to the challenged identifications, he is entitled to summary judgment on this theory.

"[A] trial court should suppress identification evidence on due process grounds where there is a very substantial likelihood that there was an irreparable misidentification."  United States v. De León-Quiñones, 588 F.3d 748, 753 (1st Cir. 2009) (internal quotation marks and citations omitted).  To determine if an identification is unduly suggestive, the Court undertakes a two-step analysis.  "The first step is to decide whether there was an impermissibly suggestive procedure. . . .  [The second step] is to decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure."  United States v.

---

[26] Plaintiff abandoned any due process claim premised on unduly suggestive identification procedures against Zuk, Cooney, Rowe, and Hollow.  [ECF No. 312 at 54].

Henderson, 320 F.3d 92, 100 (1st Cir. 2003) (internal quotation marks and citations omitted).

Reliability is assessed using the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation.

Id.

Plaintiff characterizes the procedures Roach, Garvin, Gokas, Scannell, and Luise used with Isidoro as "extraordinarily suggestive."  [ECF No. 312 at 55].

            a.      Luise, Scannell, and Gokas

Luise, Scannell, and Gokas were present at the Rincon Criollo, but not at any other location where Isidoro identified Plaintiff.  Thus, any suggestive identification claim against them must be based on what happened at the Rincon Criollo.  Plaintiff's Rincon Criollo argument essentially ignores the uncontroverted facts in the record that demonstrate Isidoro saw Plaintiff at a barber shop, went to the Lynn Police Department on his own accord, recounted what he saw to the officers there through an interpreter, and then returned to the area and pointed Plaintiff out to police officers.

 Plaintiff appears to be arguing that even assuming Defendants' version of the events are true, Scannell, Luise, and Gokas orchestrated a one-man show-up in which they brought Plaintiff and Juan outside of the restaurant to talk with them when Isidoro was present.  [ECF No. 312 at 60 (stating that "Scannell, Luise, and Gokas orchestrated a show-up at a restaurant where two suspects alone were shown to Isidoro and was asked if they were the perpetrators" and arguing that is a "classically suggestive identification")].  Plaintiff relies on De León-Quiñones, where the First Circuit rejected the government's argument that an identification could not be suggestive because it was not orchestrated or staged by the government.  588 F.3d at 753.  In that

case, a witness testified at a bank robbery trial and was asked if she could identify the culprit in the courtroom.  Id. at 751.  Even though the defendant was present in the courtroom, the witness could not identify the culprit.  Id.  Then, during a recess in the trial, the witness saw the defendant being taken from the courtroom in handcuffs and told the prosecutor that she now recognized the defendant as the robber.  Id.  She testified again and identified the defendant.  Id.  The First Circuit assumed that this identification was unduly suggestive.  Id. at 754.  The differences between Plaintiff's case and De León-Quiñones are readily apparent.  Here, Isidoro saw Plaintiff outside of any judicial or law enforcement setting—at a barber shop—and, of his own volition, went to the police, brought the police to the scene, and then pointed Plaintiff out to the police.[27]

Accordingly, no reasonable jury could find that Luise, Scannell, or Gokas engaged in an unduly suggestive identification.

          b.      Garvin and Roach

It is undisputed that Garvin and Roach showed Isidoro two photo arrays with Plaintiff after his arrest and before the live line-up.

Plaintiff argues that these photo arrays were unduly suggestive because: (1) Isidoro had already identified Bonifacio as a suspect and rejecting that identification is equivalent to telling Isidoro "that he picked the wrong person and should try again;" (2) the first time Isidoro identified Plaintiff was in the photo array after Isidoro had already seen Plaintiff and after Plaintiff's arrest; (3) the photo array included only one photo of a known suspect and all of the

---

[27] Plaintiff also draws comparisons to the "show up" in Stoval v. Denno, 388 U.S. 293 (1967), abrogated by United States v. Johnson, 457 U.S. 537 (1982), which was criticized by the Supreme Court, though ultimately found to be proper on exigency grounds.  In that case, the defendant was identified by police, arrested, and then brought to the victim's hospital bed for an identification.  These facts are entirely different than those currently before the Court.

fillers were strangers; (4) the fillers did not resemble Plaintiff or the initial description Isidoro

had given of the suspects; (5) Isidoro was repeatedly shown photos of Plaintiff, while the fillers

varied, which had the effect of ensuring Isidoro would pick Plaintiff every time he was presented

in an identification procedure; (6) Isidoro was vulnerable to influence due to his cognitive

abilities; and (7) Plaintiff was innocent and an innocent man "does not get identified by different

witnesses without suggestion."  [ECF No. 312 at 55–58].  Plaintiff also argues that the

identifications were unreliable because Isidoro previously identified Bonifacio, his description of

the suspects changed after the initial interview, there was a gap of about two years between the

crime and the in-court identification, and other evidence suggests that Plaintiff is innocent.  [Id.

at 59].

Garvin and Roach contend that the initial, non-suggestive identification at the Rincon

Criollo is all that matters, and regardless, the procedures used in the photo arrays were not

unduly suggestive.  [ECF No. 281 at 13–14; ECF No. 282 at 14].

Garvin and Roach rely on United States v. Crews, 445 U.S. 463 (1980), to support the

proposition that the suggestiveness of any subsequent identifications is irrelevant when the initial

identification is not suggestive.  [ECF No. 281 at 14–15; ECF No. 282 at 14].  In Crews, several

women were assaulted near the Washington Monument.  445 U.S. at 466.  Police in the area

encountered the defendant who matched the victims' description of the perpetrator.  Id.  Due to

weather conditions, police were unable to take a photograph of the defendant at the scene.  Id. at

467.  The defendant, who was 16 years old, was taken into custody under the guise of a truancy

violation.  Id.  While at the police station, his photo was taken.  Id.  The photo was then put into

an array and shown to two victims, who selected the defendant as their attacker.  Id.  The

defendant was taken into custody again, put into a live line-up, and identified by the two victims

who had identified him in the photo arrays.  Id.  After extensive testimony on the subject, the

trial judge ultimately suppressed these two identifications, holding that the initial arrest was

made without probable cause and all subsequent identifications stemming from the photo at the

police station were products of that unlawful arrest.  Id. at 467–68.  The judge did, however,

allow the victims to testify at trial after "conclud[ing] that the victims' ability to identify [the

defendant] in court was based upon independent recollection untainted by the intervening

identifications."  Id. at 468.  The Court of Appeals reversed and ordered the in-court

identification suppressed.  Id.  The Supreme Court disagreed and held that the in-court

identification was not the product of unlawful misconduct in that case and was admissible.  Id. at

477.  Contrary to Garvin and Roach's argument, however, that ruling does not stand for the

proposition that any subsequent identification procedure that follows an initial identification

cannot be unduly suggestive or influence an in-court identification.  To the contrary, the

Supreme Court stated,

> This is not to say that the intervening photographic and lineup identifications—both
> of which are conceded to be suppressible fruits of the Fourth Amendment
> violation—could not under some circumstances affect the reliability of the in-court
> identification and render it inadmissible as well.  Indeed, given the vagaries of
> human memory and the inherent suggestibility of many identification procedures,
> just the opposite may be true.  But in the present case the trial court expressly found
> that the witness' courtroom identification rested on an independent recollection of
> her initial encounter with the assailant, uninfluenced by the pretrial identifications,
> and this determination finds ample support in the record.  In short, the victim's
> capacity to identify her assailant in court neither resulted from nor was biased by
> the unlawful police conduct committed long after she had developed that capacity.

Id. at 472–73.

Accordingly, Crews is distinguishable for several reasons, including that it analyzed

admissibility of identifications that were the product of an unlawful arrest, not their

suggestiveness, and there was extensive testimony to demonstrate that the suppressed

out-of-court identifications did not impact the eyewitness's in-court testimony.

Therefore, Garvin and Roach's strongest argument in favor of summary judgment is that the frequency and composition of the photo arrays were not unduly suggestive.  But, based on the facts, including that Mitchell himself conceded that he would not have shown a witness a photo array prior to a line-up, this is a question that must be left to the jury.  See Schand, 380 F. Supp. 3d at 141.  Accordingly, Garvin and Roach are not entitled to summary judgment on this issue.

### 5. Qualified Immunity[28]

"Under the doctrine of qualified immunity, police officers are protected 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Qualified immunity is not merely a defense to liability, but rather shields a police officer from suit altogether. Id.  The First Circuit employs the following analysis to determine whether a defendant is entitled to qualified immunity:

> (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation.  The second prong, in turn, has two parts. We ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his conduct violated the right.

---

[28] In relation to Count I, Garvin's, Roach's, and Guillermo's qualified immunity arguments do not address the unduly suggestive identifications or fabrication theories, and instead focus on the suppression theory.  [ECF No. 281 at 49; ECF No. 282 at 40].   Accordingly, the Court does not, at this time, consider whether these defendants are immune to claims premised on fabrication or suggestive identifications.

Id. at 32–33 (citations omitted).  "The 'salient question' is whether the state of the law at the time

of the violation gave the defendant fair warning that his particular conduct was unconstitutional."

Drumgold, 707 F.3d at 42 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

Turning to the first prong, as discussed in Section III.A.2 above, the due process claim

against Roach, Guillermo, and Garvin has survived summary judgment and therefore a

reasonable jury could find that Plaintiff has made out a violation of a constitutional right.[29]

For the second prong, though not entirely clear, Roach, Guillermo, and Garvin appear to

argue that at the time of Daniel's homicide investigation there was no clearly established right to

have the Bonifacio Report turned over to the defense because: (1) there was no settled right to

have the police disclose a report naming a non-suspect in an unrelated crime, and (2) a

reasonable officer would not find the Bonifacio Report material.  [ECF No. 281 at 48–50; ECF

No. 282 at 38–41].

The affirmative disclosure obligation imposed by Brady was not expanded to include law

enforcement until 1995.  Drumgold, 707 F.3d at 43.  Where deliberate suppression is involved,

however, the First Circuit has explained that "[t]here can be no doubt that, under the line of cases

running from Mooney and Pyle to Brady, the law was firmly settled [by 1989] that a law

enforcement officer may not deliberately suppress material evidence that is favorable to a

defendant."  Id.

Because Plaintiff is asserting that Garvin, Roach, and Guillermo deliberately suppressed

evidence, summary judgment on qualified immunity grounds is inappropriate.  It was clearly

established by 1994 that police officers cannot deliberately suppress material evidence, and to

the extent they acted deliberately, "a reasonable officer in [their] position plainly would have

---

[29] Because the Court has already granted summary judgment on Count I in favor of Luise, Scannell, Gokas, Cooney, and Zuk, any qualified immunity defense is moot.

appreciated the wrongfulness of his conduct." Drumgold, 707 F.3d at 43.  Roach's, Guillermo's, and Garvin's arguments assume that the Bonifacio Report was not material because the crimes were not similar and that they had no duty to disclose such information.  As explained above, however, questions of fact regarding the exculpatory nature of the report, as well as the other allegedly suppressed evidence which these defendants have not addressed, still remain. Accordingly, Garvin, Guillermo, and Roach are not entitled to qualified immunity.

In sum, Zuk's, Cooney's, Scannell's, Luise's, and Gokas's motions for summary judgment on Count I are GRANTED in their entirety.  Guillermo's motion for summary judgment on Count I is GRANTED as to the unduly suggestive identification theory but otherwise DENIED.  Garvin's and Roach's motions for summary judgment on Count I are DENIED.  At trial, the Court may consider the qualified immunity issue again depending on the evidence presented.

**B.     42 U.S.C. § 1983 Due Process (Count I) – Supervisory Liability**

Plaintiff argues that Hollow and Rowe violated his due process rights under a § 1983 supervisory liability theory.[30]  Plaintiff contends that Hollow's failure to promulgate written policies regarding the requirements to record and disclose exculpatory evidence demonstrates that he was deliberately indifferent to his subordinates engaging in that very conduct.  [ECF No. 312 at 70].  Plaintiff also contends that Hollow and Rowe's failure to train their subordinates on evidence documentation, maintenance, and disclosure also shows deliberate indifference towards a potential civil rights deprivation.  [Id.].  Finally, Plaintiff argues that Rowe and Hollow supervised the investigation with deliberate indifference.  [Id. at 70–71].

---

[30] Plaintiff abandoned his § 1983 supervisory liability claim against Roach and Scannell.  [ECF No. 312 at 69].  Accordingly, Roach and Scannell's motions for summary judgment on the supervisory liability issue are GRANTED.

In § 1983 actions, "[g]overnment officials may not be held liable for the unconstitutional

conduct of their subordinates under a theory of *respondeat superior*[, but] supervisory officials

may be liable on the basis of their own acts or omissions."  Sanchez v. Pereira-Castillo, 590 F.3d

31, 49 (1st Cir. 2009) (citations and internal quotation marks omitted).  "[L]iability cannot rest

solely on a defendant's position of authority."  Ocasio-Hernández, 640 F.3d at 16.  As the First

Circuit explained,

> [A] supervisory official may be held liable for the behavior of his subordinates
> only if (1) the behavior of his subordinates results in a constitutional violation, and
> (2) the supervisor's action or inaction was affirmatively linked to that behavior in
> the sense that it could be characterized as supervisory encouragement, condonation
> or acquiescence or gross negligence amounting to deliberate indifference.

Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (internal citations, brackets, and quotations

omitted).

The supervisory liability standard encompasses causation as well as a deliberate

indifference element, which is to say that "[d]eliberate indifference alone does not equate with

supervisory liability, but rather causation is also an essential element, and the causal link

between a supervisor's conduct and the constitutional violation must be solid."  Justiniano v.

Walker, 986 F.3d 11, 20 (1st Cir. 2021) (internal quotation marks, citations, and brackets

omitted).  The First Circuit recently acknowledged that the causation element is a difficult one to

meet, though it may be met with evidence of a history of widespread abuse that would alert a

supervisor to ongoing violations or "in a narrow range of circumstances" where a violation "is a

highly predictable consequence of a failure to equip law enforcement officers with specific tools

to handle recurring situations."  Id. at 20–21 (internal quotation marks and citations omitted).

Taking the evidence in the light most favorable to Plaintiff, he has demonstrated that:

(1) Hollow was at the crime scene; (2) Hollow and Rowe supervised officers in the Lynn Police

Department; (3) there is a dispute as to whether written policies or trainings regarding when and how to disclose exculpatory evidence existed, see [ECF No. 329 ¶ 89]; (4) as supervisors of the day-to-day operations at the Lynn Police Department, Hollow and Rowe were aware of the murder investigation, [ECF No. 307-15; ECF No. 287 ¶ 25; ECF No. 329 ¶ 8]; and (5) Rowe may have occasionally reviewed reports from detectives and had access to the case file, [ECF No. 305-27 at 60 (Hollow's testimony that a Captain could oversee the detective bureau, though not naming Rowe specifically); ECF No. 305-19 at 62].

Regarding Hollow and Rowe's supervision, it is undisputed that pursuant to a statute the District Attorney controlled the homicide investigation. Even assuming that Rowe and Hollow were still reviewing documents relating to the murder investigation, Plaintiff only relies on the conclusory assertion that a jury could infer that this means Hollow and Rowe were aware their subordinates were violating Plaintiff's constitutional rights. Because there is no evidence that Hollow or Rowe were aware of any violations, Plaintiff's speculation and improbable inferences are not enough to demonstrate the requisite strong causal connection needed to establish supervisory liability.

Turning to the lack of written policies and trainings, there is no evidence in the record demonstrating that Rowe had any role in promulgating policies or carrying out trainings. His mere position as a Captain is not sufficient to impose liability on this ground. Ocasio-Hernández, 640 F.3d at 16.

This theory presents a closer call for Hollow. Hollow maintains that the District Attorney was in charge of the homicide investigation, which destroys the causal chain between the Lynn Police Department's lack of policies and any constitutional violations. The District Attorney's role, however, does not speak to whether the Lynn Police Officers were properly trained.

Defendants have not put forth conclusive evidence showing that the Lynn Police Department trained its officers regarding their disclosure obligations.  While there is no evidence in the record that there was a widespread pattern of constitutional violations relating to evidence disclosures and documentation, a reasonable jury could find that not informing or training officers of their duties to disclose exculpatory evidence led to the highly predictable consequence that officers would, in fact, fail to disclose exculpatory evidence.

Finally, Hollow argues that this claim is barred by qualified immunity because the law regarding when supervisory liability could be imposed was not established until May 1994 and the bulk of Plaintiff's investigation took place before that.  Hollow draws this conclusion from Penate v. Hanchett, 944 F.3d 358, 367 (1st Cir. 2019), which cites to a 1994 First Circuit opinion on supervisory liability.  Contrary to Hollow's assertion, the First Circuit does not state that the 1994 opinion is the earliest case establishing supervisory liability under § 1983.  Caselaw from the First Circuit outlines the contours of supervisory liability well before 1994.  For example, in 1989, the First Circuit wrote,

> We have addressed the limits of supervisory liability under § 1983 in the past.  We note first that liability may not be predicated upon a theory of *respondeat superior*. See Lipsett v. University of Puerto Rico, 864 F.2d 881, 901–02 (1st Cir.1988); Guzman v. City of Cranston, 812 F.2d 24, 26 (1st Cir.1987); Woodley v. Town of Nantucket, 645 F. Supp. 1365, 1372 (D. Mass. 1986).  A supervisor "may be found liable only on the basis of her own acts or omissions." Figueroa v. Aponte–Roque, 864 F.2d 947, 953 (1st Cir. 1989); see Guzman, 812 F.2d at 26.  It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others.  See Germany v. Vance, 868 F.2d 9, 17–18 (1st Cir. 1989).  Finally, there must be "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." Woodley, 645 F. Supp. at 1372 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)); see Lipsett, 864 F.2d at 902.

Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).  In light of this, Hollow is not entitled to qualified immunity on any supervisory liability claims.[31]

Accordingly, Rowe's motion for summary judgment is GRANTED as to Count I, and Hollow's motion for summary judgment is DENIED as to Count I.

### C.       42 U.S.C. § 1983 Due Process (Count I) – Monell Claim against the City

Although "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," § 1983 does impose "liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights."  Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691–92 (1978).  "[A] plaintiff must show that the violation occurred as a result of the municipality's 'policy or custom.'"  Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Monell, 436 U.S. at 694).

Plaintiff argues the City is liable because it failed to: (1) adequately train and supervise its officers on disclosing exculpatory evidence; and (2) have policies in place concerning the obligation to disclose evidence to state prosecutors, to document investigative developments in a homicide investigation, to maintain certain materials in investigative files, or to take and preserve notes during investigations.[32]  [ECF No. 312 at 65–68].

"Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but

---

[31] As the Court understands it, Hollow's argument focuses on when the general concept of supervisory liability was established and does not address or rely on whether the specific theory of supervisory liability at issue here—a failure to train—was established in 1994.  Although the Court declines to find that Hollow is entitled to qualified immunity based on the current record, the Court may reconsider this theory at trial based on the evidence presented.

[32] Plaintiff's municipal liability theory appears to center on the due process violations related to the failure to disclose exculpatory evidence, rather than fabricating evidence or unduly suggestive identification procedures.  [ECF No. 312 at 65–68].

nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies." Gray v. Cummings, 917 F.3d 1, 14 (1st Cir. 2019) (quoting Haley, 657 F.3d at 52). For the City to be liable for failing to train, "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005). Further, "[i]t is not enough to show that the Town's training regimen was faulty; [the plaintiff] must also show that the Town knew or had reason to believe that such a regimen had unconstitutional effects." Gray, 917 F.3d at 14. "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.'" Id. (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)).

Plaintiff does not dispute that there is no evidence in the record showing a pattern of similar constitutional violations related to suppressing evidence. Plaintiff instead contends that this is a case where the failure to train would so obviously lead to a constitutional violation that a single incident is sufficient to give rise to liability. [ECF No. 312 at 67–68]. Plaintiff relies on Connick v. Thompson, which noted that previous Supreme Court precedent "left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference" and that a single incident could be sufficient. 563 U.S. 51, 63 (2011) (internal quotation marks and citation omitted). The City counters that this case does not fit into the narrow range of circumstances where a single incident can give rise to liability because it differs drastically from the examples given in Supreme Court and First Circuit precedent, which concerned the use of deadly force and the predictable use of such force in the absence of training.   [ECF No. 328 at 5].

Although this case does not involve deadly force, a reasonable jury could find that failing to train officers on their obligations to disclose exculpatory evidence leads to the highly predictable consequence that officers will not disclose exculpatory evidence. In Connick, the Supreme Court noted that a failure to train prosecutors on their Brady obligations does not fall within the narrow range of conduct that would give rise to single incident liability because "[a]ttorneys are trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment." 563 U.S. at 64. In reaching this decision, the court hypothesized that it might reach a different outcome if police officers were not trained because police officers, unlike prosecutors, lack knowledge of the law and "in the absence of training, there is no way for novice officers to obtain the legal knowledge they require." Id. Since Connick, at least one other court has also declined to grant summary judgment when faced with claims that a municipality failed to adequately train their police officers on Brady obligations. Crews v. Cty. of Nassau, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014) ("[I]f plaintiff's evidence is credited and construed most favorably to plaintiff, a reasonable jury could conclude that, because police officers do not come to their jobs trained in the law, a municipality's failure to train them on how to handle exculpatory evidence has the obvious consequence of leading to constitutional violations, such that a single incident can give rise to Monell liability."); cf Gregory v. City of Louisville, 444 F.3d 725, 754 (6th Cir. 2006) (holding that the "district court erred when it failed to consider that evidence of failure to train on the proper handling of exculpatory materials has the highly predictable consequence of constitutional violations") (internal quotation marks omitted).

For similar reasons, Plaintiff's theory that the City failed to promulgate a policy relating to disclosure requirements will also survive summary judgment. "The Supreme Court has

recognized that <u>Monell</u> liability can arise from such decisions because a 'city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution."'"  <u>J.K.J. v. Polk Cnty.</u>, 960 F.3d 367, 378 (7th Cir. 2020) (quoting <u>Connick</u>, 563 U.S. at 61–62).  Although there is a dispute as to whether it had policies regarding the disclosure of exculpatory evidence, [ECF No. 329 ¶ 89], the City maintains that it was not on notice that failing to have a detailed exculpatory evidence policy would cause a constitutional violation, [ECF No. 328 at 3].  Like the failure to train allegation, the failure to promulgate a policy theory also requires a causal link between the City's inaction and the constitutional deprivation, which can normally be shown via a pattern of past violations, but liability may also occur in the face of an "obvious and known risk."  <u>J.K.J.</u>, 960 F.3d at 381.  Here, failing to have a policy on disclosing exculpatory evidence creates a known and obvious risk that police officers would withhold such evidence.[33]

Accordingly, triable issues about the City's liability exist, and the City's motion for summary judgment on Count I is therefore <u>DENIED</u>.[34]

---

[33] Although the City frequently raises the fact that the investigation was run by the District Attorney and the MSP, it is not clear that this precludes a finding that the Lynn Police Officers that assisted on the investigation were not adequately trained or that the Lynn Police Officers did not also have to abide by their own department's policies and procedures.  Thus, there exist disputes of fact regarding the role of the City's training and policies in any alleged civil rights violations.

[34] Plaintiff also argues that the City is liable for Hollow's failure to adopt policies, which led to the violation of Plaintiff's rights.  It is unclear how this theory differs from the general allegation that the City failed to have any policy addressing exculpatory evidence, and, given the Court's finding that the failure to adopt a policy claim may proceed to trial, the Court need not and does not address this theory.

### D.     42 U.S.C. § 1983 Conspiracy Claims (Count III)[35]

A civil rights conspiracy as commonly defined is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages. While [Plaintiff is] correct that conspiracy is a matter of inference, summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations.

Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (internal quotation marks and

citations omitted).  "To prevail on a claim of conspiracy, plaintiff need not prove an express

agreement, but merely that there is sufficient circumstantial evidence of an agreement to

conspire."  Wickers v. Gouin, No. 07-cv-12235, 2011 WL 832500, at *8 (D. Mass. Mar. 3,

2011).

Defendants all argue that there is no evidence in the record to show an agreement to

violate Plaintiff's civil rights.  [ECF No. 281 at 34–41; ECF No. 282 at 15–24; ECF No. 286 at

47–48; ECF No. 291 at 11–12; ECF No. 293 at 35–36].  In light of the Court's finding on the due

process claims, a reasonable jury could find that Garvin, Roach, and Guillermo conspired to

violate Plaintiff's right to a fair trial.  Accordingly, Garvin's, Roach's, and Guillermo's motions

for summary judgment on Count III are DENIED.

Conversely, Zuk, Luise, Scannell, Gokas, Rowe, Hollow, and Cooney are entitled to

summary judgment.  Plaintiff's theory is essentially that constitutional violations occurred and

because the individual defendants all jointly investigated the homicide, no matter how minor

their role, they were all in agreement to violate his rights.  Plaintiff has put forth no direct or

circumstantial evidence to support the inference that Zuk, Luise, Scannell, Gokas, Rowe, Hollow

or Cooney entered into an agreement.  He relies only on conclusory allegations, speculation, and

---

[35] Plaintiff does not bring this claim against the City, [ECF No. 312 at 63 n. 48], and the City's motion for summary judgment on Count III is GRANTED.

improbable inference.  Accordingly, Zuk's, Luise's, Scannell's, Gokas's, Rowe's, Hollow's, and Cooney's motions for summary judgment on Count III are <u>GRANTED</u>.

### E.    Malicious Prosecution Under Massachusetts State Law (Count V)

"To make out a claim for malicious prosecution, a plaintiff must prove: (1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff."  <u>Gutierrez v. Mass. Bay Transp. Auth.</u>, 772 N.E.2d 552, 561 (Mass. 2002) (citations omitted).  As to the first element, "[i]n broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated."  <u>Limone v. United States</u>, 579 F.3d 79, 89 (1st Cir. 2009).  Swearing out a criminal complaint is the "paradigmatic example" of initiating proceedings, but "initiate" also encompasses a broader range of conduct.  <u>Id.</u>  "[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission."  <u>Morelli v. Webster</u>, 552 F.3d 12, 21 (1st Cir. 2009).  "The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause."  <u>Wilson v. Fairhaven</u>, No. 18-cv-11099, 2021 WL 1387778, at *13 (D. Mass. Mar. 8, 2021) (citing <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386 F.3d 5, 10 (1st Cir. 2004)).  Finally,

> [t]o raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that [the defendant] (1) knew there was no probable cause, and (2) acted with an improper motive . . . i.e., acted primarily for a purpose other than that of properly adjudicating the claim.

<u>Damon v. Hukowicz</u>, 964 F. Supp. 2d 120, 140 (D. Mass. 2013) (some alterations in original) (citation omitted).

Defendants contend that summary judgment is appropriate because the record demonstrates that there was ample probable cause. [ECF No. 281 at 55–59; ECF No. 282 at 24–25; ECF No. 286 at 49–54; ECF No. 291 at 11–12; ECF No. 293 at 39–41]. Plaintiff argues that, when taken in the light most favorable to him, the evidence shows that all of the judicial proceedings that found probable cause (i.e., the arrest warrant, the probable cause hearing, the grand jury) were based on unduly suggestive and fabricated identifications from Isidoro and Sevinor, and false evidence cannot support a finding of probable cause.[36] [ECF No. 312 at 72–73]. While those initiating legal proceedings certainly cannot manufacture their own probable cause, that is not what happened here. It is undisputed that (1) legal proceedings were initiated when an arrest warrant for Plaintiff was issued, Meehan v. Town of Plymouth, 167 F.3d 85, 90 (1st Cir. 1999); (2) Roach applied for the arrest warrant after confirming that Isidoro identified Plaintiff at the Rincon Criollo; and (3) at that point in time, Isidoro had not participated in any identification procedures involving Plaintiff other than his spontaneous identification of him on the street. And, as the Court has found, this identification was not unduly suggestive or fabricated. This statement from an eyewitness, even uncorroborated, which indicated that Plaintiff was at the scene and involved in the murder of Daniel is sufficient to show probable cause. Accordingly, because the record demonstrates that there is no genuine dispute as to whether there was probable cause to initiate legal proceedings against Plaintiff, the individual defendants' motions for summary judgment on this claim are GRANTED.

---

[36] Sevinor was not identified as a witness until a year after Plaintiff was arrested and criminal proceedings were already initiated. Sevinor's testimony, fabricated or not, cannot be said to have had any role in instituting the criminal proceedings against Plaintiff.

**F.      Intentional Infliction of Emotional Distress ("IIED") (Count VII)**

Under Massachusetts law, "[t]o make out a claim of intentional infliction of emotional distress, the [plaintiff must] show (1) that [the defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014). "The standard for making a claim of intentional infliction of emotional distress is very high." Id. (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996)). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (alterations in original) (quoting Roman v. Trs. of Tufts Coll., 964 N.E.2d 331, 341 (Mass. 2012)).

Plaintiff's § 1983 due process claims have survived against Roach, Garvin, and Guillermo. A reasonable jury could find that engaging in conduct that violated Plaintiff's right to a fair trial, including fabricating and suppressing evidence, that then led to his imprisonment for almost two decades is outrageous and extreme conduct. See Bazinet v. Thorpe, 190 F. Supp. 3d 229, 240 (D. Mass. 2016) ("[P]olice officers fabricating evidence in an effort to obtain criminal charges against an innocent citizen who was in the midst of a suicidal breakdown— would be sufficient to meet the high standard for a claim of IIED."). Accordingly, summary judgment is not appropriate as to those defendants, and Roach's, Garvin's, and Guillermo's motions for summary judgment on Count VII are DENIED.

Because the Court has determined that Plaintiff has failed to present evidence that Zuk, Cooney, Hollow, Scannell, Luise, Rowe, or Gokas intentionally suppressed or fabricated evidence, and Plaintiff has not pointed to any other conduct on the part of these defendants that is

extreme or outrageous, these defendants' motions for summary judgment on Count VII are

GRANTED.

### G.     Negligence and Negligent Infliction of Emotional Distress ("NIED") (Counts VI and VIII)

Plaintiff is only pursuing his negligence claims against the City.  [ECF No. 312 at 76

n.63].  Accordingly, the individual defendants' motions for summary judgment on those claims

are GRANTED.

Under the Massachusetts Tort Claims Act ("MTCA"), "[p]ublic employers shall be liable

for injury or loss of property or personal injury or death caused by the negligent or wrongful act

or omission of any public employee while acting within the scope of his office or employment

. . . ."  Mass. Gen. Laws ch. 258, § 2; see also Arroyo v. City of Boston, No. 20-cv-12082, 2021

WL 2338879, at *8 (D. Mass. June 8, 2021) ("[W]hile public employees are immune from suit

based on allegedly negligent conduct, 'liability for the negligent acts of a public employee

committed with the scope of employment is visited upon the public employer, and not the

employee.'" (quoting Nasir v. Town of Foxborough, No. 19-cv-11196, 2020 WL 1027780, at *5

(D. Mass. Mar. 3, 2020))).

Plaintiff submits three theories in support of his negligence claim against the City:

(1) negligent supervision and training of its police officers; (2) negligent infliction of emotional

distress; and (3) negligent investigation.  [ECF No. 312 at 77].

#### 1.     Presentment

As a threshold matter, the City argues that Plaintiff did not *properly* present his claim

because he mailed his claim to City Hall on June 16, 2016, just one day before the suit was filed,

and, although it made it to the mail room, there is no evidence that it was ever received by the

Mayor.  The City also argues that Plaintiff did not *timely* present any claims arising from

disclosure of the Bonifacio-related evidence because he has been aware of those claims since at least February 2014 and he should have presented those claims by February 2016 to satisfy the two-year statute of limitations.

Pursuant to the MTCA, a tort claim may not be brought against a public employer unless the plaintiff "first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose, and such claim shall have been finally denied by such executive officer in writing."  Mass. Gen. Laws ch. 258, § 4.  The Massachusetts Supreme Judicial Court recently "conclude[d] that presentment occurs upon delivery to the office of the proper executive officer" and not upon being put in the mail or actual receipt by the official.  Drake v. Town of Leicester, 140 N.E.3d 413, 416 (Mass. 2020).

At the motion to dismiss stage, the Court acknowledged that Plaintiff did not comply with the presentment requirement, but allowed the claim to proceed because it would be a waste of time and resources to require Plaintiff to resubmit his claims to the City, wait six months, and then refile his lawsuit.  [ECF No. 96 at 26].  The City raises the presentment claim again and asserts that, with the benefit of discovery, it is obvious that Plaintiff did not satisfy the presentment requirement because the Mayor did not have actual notice of Plaintiff's claims.

Drake shows that the Mayor's actual receipt of the claim is not necessary so long as it was received by his office.  Id.  The City does not dispute that the letter arrived to the mail room in City Hall or that the Mayor's office is located within City Hall, and it has not put forth facts indicating what the proper mailing address should have been to ensure that the letter would have been delivered to the Office of the Mayor once it reached City Hall.  Accordingly, triable facts still exist as to whether the letter was received by the Office of the Mayor.

The City next argues that any negligence claim arising from the Bonifacio-related disclosures is barred by the statute of limitations because the claim was not presented within two years of Plaintiff's knowledge of the claim. [ECF No. 285 at 80–82]. Under the MTCA, a claim must be presented "within two years after the date upon which the cause of action arose." Mass. Gen. Laws ch. 258, § 4. "The discovery rule . . . is applicable to the presentment requirement." Krasnow v. Allen, 562 N.E.2d 1375, 1378 (Mass. App. Ct. 1990); see also Pettengill v. Curtis, 584 F. Supp. 2d 348, 362 (D. Mass. 2008) ("The discovery rule also applies to the presentment period because it counts from when a cause of action arose."). Under the Massachusetts discovery rule, "a cause of action for negligence accrues when 'a plaintiff knows or reasonably should know that [he] has sustained appreciable harm as a result of a defendant's negligence.'" Khatchatourian v. Encompass Ins. Co. of Mass., 935 N.E.2d 777, 780 (Mass. App. Ct. 2010) (citation omitted).

The City argues that Plaintiff's post-conviction filings demonstrate that, by February 27, 2014, at the latest, he was aware that exculpatory evidence related to Bonifacio was withheld, because that is when Plaintiff, through counsel, sent a letter to the District Attorney requesting exculpatory evidence about Bonifacio that he believed to have been withheld. [ECF No. 285 at 81; ECF No. 294-72]. In that letter, Plaintiff explains that he filed a motion for a new trial because he believed that exculpatory evidence relating to Bonifacio was withheld. [ECF No. 294-72].

In Haley, which assessed timely presentment for an exculpatory evidence claim, the First Circuit determined that "the accrual date for a negligence claim of this genre" was the date the plaintiff obtained the exculpatory evidence pursuant to a records request because that is when the plaintiff discovered, or should have discovered, the injury. 657 F.3d at 54–55. Here, the record

demonstrates that at least by February 2014, which was over two years before his presentment, Plaintiff was aware that he was harmed by the defendants' failure to disclose exculpatory evidence relating to Bonifacio, which prompted him to file a motion for a new trial. Accordingly, any negligence claim premised on the Bonifacio-related evidence is untimely and barred by the statute of limitations.

> 2.   Merits

Plaintiff has only cursorily developed his negligence argument, and, in one paragraph, argues that three different negligence theories should go forward.  [ECF No. 312 at 77].  First, he argues that his negligent supervision and training theory should proceed, and he appears to rely solely on the argument made in support of his failure to train and supervise claim under § 1983. [Id.].  In light of the Court's ruling on the Monell claims, a reasonable jury could find in Plaintiff's favor on this theory as well.  Weiss v. Lavallee, No. 01-cv-40177, 2005 WL 8176485, at *22 (D. Mass. Oct. 7, 2005) (noting that "the negligence required for recovery under the MTCA for alleged inadequate police training is similar, if not identical, to the deliberate indifference required under § 1983 in municipal liability claims" (citing Parker v. Town of Swansea, 270 F. Supp. 2d 92, 101–02 ( D. Mass. 2003))).

Second, Plaintiff advances a "negligent investigation" theory that he asserts is actionable where an officer is careless or reckless in misstating or failing to disclose relevant information. [ECF No. 312 at 77].  This claim fails because under Massachusetts law "[a]n investigator's duty runs to the person or entity on whose behalf the investigation is conducted, not to the person being investigated."  O'Connell v. Bank of Bos., 640 N.E.2d 513, 516 (Mass. App. Ct. 1994) (citations omitted); see also Kouvchinov v. Parametric Tech. Corp., No. 04-cv-12531, 2007 WL

9735536, at *4 (D. Mass. July 31, 2007); Garcia v. Garda CL New England, Inc., No. 15-cv-

13093, 2015 WL 13666731, at *18 (D. Mass. Aug. 16, 2015).  As the O'Connell court explained,

> [a] slipshod or incomplete investigation, without more, is a disservice to the one who commissioned the investigation, not to its subject.  It is not until the investigation results in ill-founded allegations or charges of criminal conduct that the subject suffers cognizable injury.  At that point, the law makes remedies available—actions for defamation, malicious prosecution, tortious infliction of emotional distress—albeit under very circumscribed conditions.
>
> The individual falsely accused is thus not remediless, but negligence alone does not make his or her accuser liable.

640 N.E.2d at 516.  Thus, Plaintiff, as the subject of the investigation, has other causes of action

available to pursue the damages resulting from the ill-founded allegations against him, but he

cannot himself assert a cause of action based on negligent investigation.  Accordingly, Plaintiff's

negligent investigation theory fails as a matter of law.

Finally, Plaintiff summarily argues that his NIED claim should be presented to a jury for

the same reasons that his IIED claims should survive summary judgment.  [ECF No. 312 at 77].

Plaintiff, however, fails to account for the fact that the elements of an NIED claim are different

than an IIED claim.  To recover for negligent infliction of emotional distress, a plaintiff must

show: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by

objective symptomatology; and (5) that a reasonable person would have suffered emotional

distress under the circumstances of the case."  Payton v. Abbott Labs, 437 N.E.2d 171, 181

(Mass. 1982).  "As with any sort of negligence, negligence in the context of an emotional

distress claim requires that the defendant have owed plaintiff a duty of care that was breached in

some way."  Lockwood v. Madeiros, No. 18-cv-40143, 2018 WL 4087938, at *8 (D. Mass. Aug.

27, 2018) (quoting Delmonte v. Laidlaw Env't Servs., Inc., 46 F. Supp. 2d 89, 98 (D. Mass.

1999)).  The complaint identifies two duties the City owed to Plaintiff: (1) the duty to refrain

from framing him for a crime he had not committed; and (2) the duty to conduct a legal and

thorough investigation of the murder that resulted in the prosecution of the correct person.  [ECF No. 1 ¶¶ 121–25].  The City counters that the NIED claim must fail because the duties alleged are not viable.  [ECF No. 328 at 12].

The City has the better argument here.  First, under § 10(c) of the MTCA, the City is immune from liability for the intentional torts of its employees.  Mass. Gen. Laws ch. 258, § 10(c).  The duty to refrain from framing a person arises from an intentional tort because it is essentially a claim that the officers involved in the investigation intentionally framed Plaintiff, which led to his improper arrest and prosecution.  Since the City cannot be held liable for the intentional torts of its employees, it follows that the City did not breach a duty of care it had to plaintiff.  See McDonald v. City of Boston, 334 F. Supp. 3d 429, 441 (D. Mass. 2018) (denying plaintiff's motion for summary judgment on a negligence claim under § 10(c) where "the crux of [plaintiff's] negligence claim is that the defendants' negligent investigation led to her false arrest").  Second, as described above, the City's duty to refrain from negligently investigating is owed to the person commissioning the investigation, not the subject of the investigation.  Garcia, 2015 WL 13666731, at *18 (granting summary judgment on NIED claim premised on duty to engage in reasonable investigation).  Because Plaintiff has not identified any actionable duty owed to him by the City, his NIED claim fails.

The City's motion for summary judgment is GRANTED as to the NIED claim and DENIED as to the negligence claim to the extent it is premised on a negligent training theory.

### H.    MCRA (Count IX)

The MCRA provides a cause of action against "any person" who

interfere[s] by threats, intimidation or coercion, or attempt[s] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass. Gen. Laws ch. 12, § 11H.  In essence, an MCRA claim is a § 1983 claim with the added

requirement of showing the interference with the right was carried out with coercion, threats, or

intimidation.  For purposes of the MCRA,

> a "threat" is the intentional exertion of pressure to make another fearful or
> apprehensive of injury or harm.  "Intimidation" involves putting a person in fear
> for the purpose of compelling or deterring conduct.  "Coercion" means the
> application to another of such force, either physical or moral, as to constrain [him]
> to do against [his] will something [he] would not otherwise have done.

Bazinet, 190 F. Supp. 3d at 239 (internal quotation marks and citations omitted).

Plaintiff makes two arguments in support of his MCRA claim: (1) in a wrongful

conviction case such as this, any distinction between § 1983 and the additional requirements

under the MCRA (i.e., to show coercion, threats, or intimidation) collapses because an arrest and

detention is intrinsically coercive; and (2) Defendants coerced Isidoro and Sevinor by fabricating

identifications from these two eyewitnesses.  [ECF No. 312 at 75].  These arguments are

unpersuasive, and no reasonable jury could find that any defendant interfered with Plaintiff's

rights through coercion, threats, or intimidation.

First, the Court finds that Plaintiff overstates the finding in Scott v. Macy's E., Inc., No.

01-cv-10323, 2002 WL 31439745 (D. Mass. 2002), which he cites to support his proposition that

an arrest or detention necessarily satisfies the MCRA's requirements.  Instead, the key inquiry is

whether the arrest or detention was intended to interfere with a protected right.  In Scott, the

Court did state that the arrest and detention of plaintiff was intrinsically coercive, but ultimately

found there was no civil rights violation.  2002 WL 31439745, at * 10.  Scott supported this

analysis by citing to Sarvis v. Bos. Safe Deposit & Tr. Co., 711 N.E.2d 911, 917 (Mass. App. Ct.

1999).  In Sarvis, the plaintiffs were asserting their right to not be evicted without proper process

and were threatened with arrest for exercising that right.  Id.  Here, there is no evidence that the

arrest and detention were intended to coerce, threaten, or intimidate Plaintiff from exercising his right to a fair trial, which is the right Plaintiff claims Defendants violated.

Second, Plaintiff does not direct the Court to any evidence to demonstrate that any defendant threatened, coerced, or intimidated Isidoro or Sevinor.  Plaintiff states that Isidoro was "effectively coerced" when he was shown two photo arrays after seeing Plaintiff at the Rincon Criollo, but this does not create a genuine issue of fact as to whether any defendant applied "such force, either physical or moral, as to constrain [Isidoro] to do against [his] will something [he] would not otherwise have done."  Bazinet, 190 F. Supp. 3d at 239.  Plaintiff does not make a direct argument with regards to Sevinor, though the Court assumes his theory may be that Sevinor only testified because he was given immunity or some other benefit.  Without more, a grant of immunity to a testifying witness is not coercive.  Accordingly, Defendants' motions for summary judgment on Count IX are GRANTED.

## I.      Massachusetts Common Law Conspiracy (Count X)

Massachusetts law recognizes both coercive conspiracies and tort-based joint-action conspiracies.  A coercive conspiracy requires Plaintiff to establish "that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently," while a conspiracy premised upon joint liability in tort may be invoked "to support liability of one person for a tort committed by another."  MacFarlane v. Town of E. Bridgewater, 110 F. Supp. 3d 310, 329 (D. Mass. 2015) (quoting Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563–64 (1st Cir. 1994)).

Plaintiff cursorily argues that the record allows him to proceed under either theory, [ECF No. 312 at 78], but as explained in the analysis of his MCRA claim, there is no evidence of coercion in this case and any claim under that theory fails.

Turning to the joint liability theory, Massachusetts courts have recognized two theories of tort-based joint liability: "(1) concert of action, and (2) substantial assistance or aiding and abetting." Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009) (internal quotation marks and citations omitted). Under a concerted action theory, "there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." Ward v. Schaefer, No. 16-cv-12543, 2021 WL 1178291, at *31 (D. Mass. Mar. 29, 2021) (citing Aetna Cas. Sur. Co., 45 F.3d at 1564). The Court has allowed the § 1983 conspiracy claim to proceed against Garvin, Roach, and Guillermo because a reasonable jury could find there was an agreement to violate Plaintiff's rights, and a jury could similarly find that these defendants engaged in a civil conspiracy under a concerted action theory. Therefore, Garvin's, Roach's, and Guillermo's motions for summary judgment on Count X are DENIED.

As to the remaining defendants, Plaintiff points to no evidence in the record that allows for the inference that Hollow, Rowe, Scannell, Luise, Gokas, Cooney or Zuk entered into an agreement with any other defendant for the purpose of carrying out a tort or depriving Plaintiff of his rights. Simply working on the investigation and communicating with each other, which is the most the record supports, is insufficient. Opalenik v. LaBrie, 945 F. Supp. 2d 168, 181 (D. Mass. 2013) (finding that evidence that two police departments communicated was insufficient to show agreement between departments and/or individual officers and granting summary judgment).

Thus, any civil conspiracy claim against Hollow, Rowe, Scannell, Luise, Gokas, Cooney or Zuk must be based on a substantial assistance theory. As the First Circuit explained,

> To recover under [the substantial assistance] theory, the plaintiff must establish two elements. First, the defendant must give substantial assistance or encouragement

to a party engaging in tortious conduct.   Only assistance or encouragement that is a substantial factor in causing the resulting tort exposes the actor to liability.  To determine whether this threshold is met, courts should consider the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind. Second, the defendant must possess an unlawful intent. Unlawful intent comprises two distinct mental states: knowledge that the other's conduct is tortious, and an intent to substantially assist or encourage that conduct.

Taylor, 576 F.3d at 35 (internal quotation marks and citations omitted).

Plaintiff does not describe with any particularity the evidence in the record that supports his theory that any defendant knew he was assisting tortious conduct or that he did in fact provide substantial assistance.  [ECF No. 312 at 78 (stating only that "[t]he record construed for [Plaintiff] permits him to proceed on both a true conspiracy theory or a theory based on vicarious liability.")].  The record does not permit a reasonable jury to find that these defendants violated Plaintiff's due process right to a fair trial, and beyond these officers playing some part in the investigation, Plaintiff has not pointed to any evidence in the record that these defendants took any actions with the requisite unlawful intent.  Therefore, Hollow's, Rowe's, Scannell's, Luise's, Gokas's, Cooney's, and Zuk's motions for summary judgment as to Count X are GRANTED.

## IV.   CONCLUSION

Accordingly, Zuk's, Cooney's, Rowe's, Luise's, Scannell's, and Gokas's motions for summary judgment are GRANTED, and Roach's, Guillermo's, Garvin's, Hollow's, and the City's motions are GRANTED in part and DENIED in part.

The following claims remain:

- Count I (§ 1983 due process violation) against Guillermo (except for the unduly suggestive identification theory), Garvin, and Roach; Hollow (under a theory of supervisory liability); and the City (under a theory of municipal liability);
- Count II (§ 1983 malicious prosecution) against the City;
- Count III (§ 1983 conspiracy) against Guillermo, Garvin, and Roach;
- Count VI (Negligence) against the City for negligent training and supervision, except to the extent that Plaintiff relies on evidence relating to Bonifacio;

- Count VII (IIED) against Guillermo, Garvin, and Roach; and
- Count X (Civil Conspiracy) against Guillermo, Garvin, and Roach.

**SO ORDERED.**

September 30, 2021

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE